**PROCESS CONTROL TECHNOLOGIES, A DIVISION OF GMC ENTERPRISES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 99–941 C.

United States Court of Federal Claims.

Aug. 2, 2002.

Johnathan M. Bailey, San Antonio, Texas, for the plaintiff.

Kevin W. McArdle, Washington, D.C., with whom were Donald E. Kinner, Assistant Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, for the Defendant. Richard C. Gross, Arlington, Virginia, of counsel.

## OPINION

BUSH, Judge.

This pre-award bid protest is currently before the court on defendant's motion for judgment upon the administrative record and plaintiff's opposition thereto. For the following reasons, defendant's motion is granted.

## BACKGROUND

### I. Factual Background

On December 11, 1995, the United States Army, White Sands Missile Range (Army) issued Request for Proposals (RFP) No. DAAD07–96–R–0103 for the purchase of wire harness kits and test fixtures for the Flexible Engine Diagnostic System, a mobile testing facility used to test turbo-shaft engines. The requirement was offered to Process Control Technologies, a division of GMC Enterprises, Inc. (Process Control; PCT) as a sole source set-aside pursuant to Section 8(a) of the Small Business Act, 15 U.S.C. § 637(a). In July 1995, the Army nominated PCT as the small disadvantaged business to meet the requirement.

The RFP states that a fixed-price, indefinite quantity contract would be awarded for a five-year term consisting of one base year and four option years. The government's Independent Cost Estimate valued the proposed contract at $4,967,693.23. The record contains a detailed breakdown of the estimate, including the prices for each part required by the contract. Sections L.21 and L.22 of the RFP required PCT to submit cost and pricing data in support of its proposed price for each contract line item.

The wire harness kits and test fixtures were to be manufactured in accordance with government-furnished drawings and delivered to the Army Depot in Corpus Christi, Texas. The wire harness test kits and test fixtures to be procured under the solicitation involved over 3,000 different parts. The Army had provided the relevant drawings to PCT four months before the RFP was issued to assist PCT in preparing its proposal.

Timely delivery was critical to the Army. Section F.5 of the RFP, "Time of Delivery" contained a Required Delivery Schedule stating that delivery of the first shipment of the minimum order quantity was due May 1, 1996, with the second, third, and fourth shipments due, respectively, July 1, 1996, September 1, 1996, and November 1, 1996. Section F.5 also states that "[o]ffers that propose delivery that will not clearly fall within the applicable required delivery period specified above, may be considered non-responsive and rejected." AR at 15.[1] Section L.0 of the RFP required PCT to submit a flow chart demonstrating how it intended to meet the Required Delivery Schedule.

As amended, the closing date of the solicitation was January 9, 1996. On January 5, 1996, PCT submitted its proposal. The proposal was not accompanied by cost and pricing data as required by section L.20 and L.21 of the RFP or the flow chart required by section L.0 of the RFP. Also, PCT's proposed price was $10,776,634—more than twice the government estimate.

On January 8, 1996, an Army contract specialist reminded PCT that cost and pricing data was required. PCT submitted some data on January 9, 1996, but, after conducting discussions with PCT, the contract specialist determined that the data was inadequate and improperly formatted. On January 10, 1996, the contract specialist asked PCT to provide additional, properly formatted cost data. In turn, PCT informed the contract specialist that it had forgotten to indicate that if its prices increased, the contract price would also increase. The contract specialist reminded PCT that the RFP was for a fixed-price contract. PCT then stated that it was unwilling to enter into a five-year fixed-price contract.

On January 11, 1996, PCT submitted additional cost data to the contract specialist. However, the contract specialist again determined that the data was unacceptable, primarily because it did not contain adequate labor rate information and because it re-

---

1. AR refers to citations in the administrative record filed by the government on February 22, 2000.

vealed a labor overhead rate of 498 percent which included substantial travel and legal costs. On that same date, Army officials again met with PCT to discuss the cost data the Army required to meaningfully evaluate PCT's proposal. The Army also informed PCT that its price far exceeded the government estimate and suggested that PCT review its costs. Moreover, the Army reduced the contract term to a base year and one option year; deleted certain items; and gave PCT additional time to deliver other items. PCT informed the Army that it would provide revised cost data by January 18, 1996.

On January 12, 1996, the contract specialist reminded PCT that it was required to submit a flow chart that would demonstrate how it intended to meet the delivery schedule. PCT stated that it had not prepared a flow chart and asked to be relieved of the requirement until some unspecified date after contract award.

By letter dated January 16, 1996, the contracting officer reiterated to PCT that timely delivery was critical and that the Army required a demonstration of how PCT intended to meet the delivery schedule before awarding a contract. The contracting officer informed PCT that no contract would be awarded without the flow chart required by section L.0 of the RFP.

On January 22, 1996, PCT submitted a "Manufacturing Schedule" pursuant to section L.0. However, the schedule extended only to May 1, 1996, the due date for the first shipment of the minimum quantity. PCT also submitted a revised cost proposal and cost data. However, PCT's revised price for a two-year contract was $3,421,708 for the base year and one option year. This figure was 175 percent higher than the government estimate of $1,954,332. Furthermore, PCT's revised cost data reflected a labor overhead rate of 330 percent, which the Army states was more than twice the rate used by other small companies similar to PCT, given the Army's experience with such firms.

On January 30, 1996, Army officials toured PCT's plant and met with PCT personnel. During the discussions, PCT provided the Army with a list of more than $110,000 worth of equipment PCT required to perform the contract. The cost of this equipment was not included in PCT's proposal, and PCT expected the government to pay for it. PCT also stated that it intended to hire eleven new employees for the contract. Finally, PCT stated that the contract would be managed by PCT's president and director of Federal contracts and business development and that one hundred percent of their salaries would be charged to the Army.

On January 31, 1996, Army officials met to discuss whether contracting with PCT was in the government's best interest. On February 2, 1996, the contracting officer decided to cancel the RFP on the basis of (1) PCT's unreasonable price; and (2) PCT's failure to adequately demonstrate that it could meet the critical delivery schedule. The contracting officer decided that the most urgently required materials would be purchased from another vendor pursuant to an existing contract and that a new solicitation would be issued for the remaining items. In reaching his decision, the contracting officer relied upon detailed written findings and Section 15.608(b) of the Federal Acquisition Regulation which provides, in pertinent part:

> All proposals received in response to a solicitation may be rejected if the agency head determines in writing that—
>
> (1) All otherwise acceptable proposals received are at unreasonable[e] prices;
>
> \* \* \* \* \* \*
>
> (4) For other reasons, cancellation is clearly in the Government's interest.

48 C.F.R. § 15.608(b) (1995).

In this matter, the responsibility for making the determination provided for in Section 15.608(b) has been delegated to the contracting officer. 48 C.F.R. § 15.608(b) (1995).

On February 5, 1996, the contracting officer informed PCT, via letter, of his decision to cancel the solicitation. On November 17, 1999, nearly four years later, PCT filed its complaint in this court. In its complaint, plaintiff seeks $238,360 for plaintiff's proposal preparation expenses; pre-and post-judgment interest upon the principal amount; and any other further relief to which plaintiff may be justly entitled.

## II. Procedural Background

Plaintiff Process Control filed its complaint on November 17, 1999. On February 17, 2000, the government filed its motion for judgment upon the administrative record and supporting statement of facts. On February 22, 2000, the defendant filed the Administrative Record. On March 29, 2000, plaintiff filed its opposition to defendant's motion for judgment on the administrative record and its counter statement of facts. On April 21, 2000, the defendant filed its reply to plaintiff's opposition to defendant's motion for judgment on the administrative record and on April 28, 2000, defendant filed its counter-statement of facts.

## DISCUSSION

### I. Jurisdiction

This court has jurisdiction over this bid protest pursuant to the Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320 § 12, 110 Stat. 3870, 3874–75 (1996) (amending the Tucker Act, 28 U.S.C. § 1491(b)), which grants the court:

> [J]urisdiction to render judgment on an action by an interested party objecting to the solicitation by a Federal Agency for bids or proposals for a proposed contract ... or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

This statutory provision grants this court jurisdiction to address Process Control's protest of the cancellation of the solicitation.

### II. Standard of Review

#### A. Standard for Pre–Award Procurement Challenges

 Under the standard of review applicable in bid protests, an agency's procurement decisions will be upheld unless shown to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." 5 U.S.C. § 706(2)(A); 28 U.S.C. § 1491(b)(4). In determining whether an agency's actions were arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law, the court must ascertain whether "'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed.Cir.2001) (quoting *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C.Cir.1994)). The "'disappointed bidder bears a heavy burden of showing that the award decision had no rational basis.'" *Id.* (internal quotations omitted). In undertaking its analysis, the court is not to substitute its judgment for that of the agency, even if reasonable minds could reach differing conclusions. *CRC Marine Services, Inc. v. United States*, 41 Fed. Cl. 66, 83 (1998). The court will interfere with the government procurement process "only in extremely limited circumstances." *CACI, Inc.–Federal v. United States*, 719 F.2d 1567, 1581 (Fed.Cir.1983) (quoting *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1372 (Fed.Cir.1983)). The court recognizes that the agency possesses wide discretion in the application of procurement regulations. *See Impresa Construzioni*, 238 F.3d at 1333. *See also Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed.Cir.1989) (stating that "'[i]f the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations'" (citation omitted)). The proper focus of this court's scrutiny is the agency's articulated rationale for the decision and the administrative record underlying it. *Camp v. Pitts*, 411 U.S. 138, 142–43, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

#### B. Standard for Entering Judgment on the Administrative Record

This action is before the court on defendant's motion for judgment upon the administrative record and plaintiff's opposition thereto. Summary judgment is designed to secure the "'just, speedy, and inexpensive

determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Federal Rule of Civil Procedure 1). Summary judgment is appropriate where there is no dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Federal Court of Claims Rule 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is material if it would affect the outcome of the suit. *Id.* at 248, 106 S.Ct. 2505.

In considering a motion for summary judgment, the court does not "weigh" each side's evidence. *Contessa Food Products, Inc. v. Conagra, Inc.,* 282 F.3d 1370, 1376 (Fed.Cir. 2002). Rather, "the court views the evidence and any disputed factual issues in the light most favorable to the party opposing the motion." *Enzo Biochem, Inc. v. Gen–Probe Inc.,* 285 F.3d 1013, 1017 (Fed.Cir.2002). That is, all doubt over factual issues must be resolved in favor of the party opposing summary judgment. *Mingus Constructors, Inc. v. U.S.,* 812 F.2d 1387, 1390 (Fed.Cir.1987). However, the non-moving party has the burden of producing sufficient evidence that there is a genuine issue of material fact in dispute which would allow a reasonable finder of fact to rule in its favor. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514. Such evidence need not be admissible at trial; nevertheless, mere denials, conclusory statements or evidence that is merely colorable or not significantly probative is not sufficient to preclude summary judgment. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2554; *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511; and *Mingus,* 812 F.2d at 1390–91.

## III. Merits

### A. Plaintiff's General Request that Supplementation of the Administrative Record is Necessary

■ PCT avers generally that the administrative record as it presently stands before the court is inadequate for proper review and, therefore, summary judgment is inappropriate. It bears noting that, in undertaking its review of an agency decision in a bid protest, the court is "'generally limited to the administrative record developed by the agency.'" *Rust Constructors Inc. v. United States,* 49 Fed.Cl. 490, 496 (2001) (quoting *Marine Hydraulics Int'l, Inc. v. United States,* 43 Fed.Cl. 664, 670 (1999)). This court will permit for supplementation of the record when it is deemed "necessary to 'preserve a meaningful judicial review.'" *SDS Int'l v. United States,* 48 Fed.Cl. 759, 765 (2001) (quoting *Cubic Applications, Inc. v. United States,* 37 Fed.Cl. 345, 350 (1997)). A court may consider extra-record evidence in situations such as these:

(1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

*Cubic Applications, Inc. v. United States,* 37 Fed.Cl. 339, 342 (1997).

■ In the instant action, plaintiff has pointed to no specific evidence that it wishes the court to consider along with the administrative record. Rather, it proffers only generalized allegations that some extra-record evidence must/should exist to strengthen its case. As discussed below, the record before the court provides an adequate explanation of the events at issue in this case, such that any supplementation of the administrative record is totally unnecessary to decide the case at bar.

### B. Reasonableness of the Government Estimate

Plaintiff avers that the record is insufficient to determine the reasonableness of the estimate upon which the government referred to in cancelling the solicitation. PCT

contends that "[t]here is no indication where those costs were derived, whether they accurately reflected current costs, whether they were adequately indexed for inflation, or what methodology was employed to arrive at the IGE." Plaintiff's Opposition at 15. Plaintiff's contention must be rejected. The record contains no apparent gaps concerning the government estimate. The Independent Government Estimate appears at pages 409–419 of the administrative record and is extensive and detailed. It is plainly not a figure "pulled from thin air," as the plaintiff suggests. Generally, independent government estimates "represent the agency's best estimate of the most reasonable current price of the products or services being procured." John Cibinic, Jr. and Ralph C. Nash, Jr., FORMATION OF GOVERNMENT CONTRACTS, 1317 (3d ed.1998). There is nothing to suggest that the government's estimate in this case deviates from that norm. The plaintiff has presented no evidence to indicate there is any shortcoming with the government's estimate. Nor has the plaintiff demonstrated that there is a genuine issue of material fact concerning this estimate. And as discussed above in conjunction with the applicable standard of review in bid protest cases, this court is only to interfere with the government's procurement processes " 'in extremely limited circumstances.' " *CACI*, 719 F.2d at 1581 (citation omitted). For the foregoing reasons, there is not evidence for this court to conclude that the government's estimate was not reasonable, nor is there evidence even suggesting such unreasonableness.

## C. PCT's Price

■ The government contends that the contracting officer properly canceled the RFP because PCT's price was unreasonable. Relying on 48 C.F.R. § 15.608(b)(1) (1995), the government notes that a solicitation may be canceled if the contracting officer determines that "[a]ll otherwise acceptable proposals received are at unreasonabl[e] prices." As the government states, "[a] determination concerning the unreasonableness of the prices bid is a matter of administrative discretion which should not be questioned unless the determination is shown to be unreasonable or that there is a showing of fraud or

bad faith." *Caddell Const. Co. v. United States*, 7 Cl.Ct. 236, 241 (1985).

The court finds that the Army was eminently reasonable and rational in cancelling the solicitation because, in part, of PCT's unreasonable price. Significantly, PCT's revised price was 175 percent higher than the government estimate and did not include $110,000 worth of equipment for which PCT expected to be reimbursed by the government. *See id.* (finding a cancellation was proper where bids were 13.87% and 16.7% over the government estimate); *Kinetic Structures Corp. v. United States*, 6 Cl.Ct. 387, 395 (1984) (stating that "[i]n determining whether a bid reflects an unreasonable price, a comparison with Government estimates is a reasonable means of making the determination"); *Bahan Dennis Inc.*, B–249,496, B–249,496.3, Mar. 3, 1994, 94–1 C.P.D. ¶ 184 (finding that a proposal exceeding government estimate by 20% was properly rejected, and the "determination regarding price reasonableness may be based on the government estimate alone").

Moreover, the government's finding that the plaintiff's price was unreasonable emerges as clearly rational when viewed in the context of (1) the detailed history of the procurement process in the case at bar; (2) certain of the plaintiff's expenses that had been figured into the proposal and also those not included in plaintiff's proposal; and (3) the extensive lengths the Army went to to attempt to work with the plaintiff concerning its price during the procurement process. The following discussion of these issues, most of which are discussed in detail in the Determination to Cancel Solicitation at AR 395–400 serves to usefully illuminate (1) the substantial difficulties the government encountered in its dealings with PCT; and (2) the eminently rational nature of the government's decision in this procurement.

To illustrate this point: On January 8, 1996, the plaintiff submitted its initial proposal in the amount of $10,776,634.28, over twice the value of the Independent Government Cost Estimate. The plaintiff did not submit the requisite cost and pricing data along with its proposal. The contract specialist then

contacted PCT and stated that cost and pricing data was required. When PCT submitted some of the required data on January 10, 1996, its representative stated that he had forgotten to indicate on the proposal that if PCT's prices went up, the contract price would go up. The contract specialist then explained this was a firm-fixed-price contract and that once a price is negotiated, there is no change. AR at 395. Also, the contract specialist ultimately concluded that the data provided by the contractor was essentially unusable. For example, the government could not identify what the base hourly rates for the direct labor personnel were, or what elements constituted the labor overhead pool. The Cost/Price Analyst, using various other data, did manage to calculate the labor overhead rate to be 498%. Moreover, the data provided for items such as travel of $12,000 per year and legal expenses of $12,000 per year. This was despite the close proximity of the contractor to White Sands Missile Range. Although the government did anticipate some legal expenses connected to the procurement process, it saw no need for such extensive legal fees spanning the life of the contract.

On January 11, 1996, a meeting was held between the Army and the contractor in order for the Army to explain the required formats and the kinds of data necessary to evaluate plaintiff's proposal. The contractor was also told during this meeting that his proposed price was "extremely high" compared to the government estimate and was instructed to re-evaluate his costs.

The contractor did not deliver the requisite data until January 23, 1996, notwithstanding that it had been agreed that the contractor would submit the information on January 22, 1996. The contractor's new proposed price, for a base and one option year, was $3,421,708, compared to the government's estimate for this same time period of $1,954,332.19. Thus, the contractor's revised proposed price was still 175% higher than expected. The government states that while some of this could be explained due to the fact that some of the long-lead items which the government intended to delete were included, the majority of the discrepancy occurred in the labor overhead.

Process Control intended to create a whole new division solely for the production of the wiring harness kits, and structured its proposal accordingly. However, the government was only guaranteeing the production of twenty-seven kits and the minimum order quantity, and there was no guarantee that any further items would be purchased under the contract. In addition, the work on the minimum order quantity and the required delivery schedule would only span about an eight month period. Based on these figures, the Army calculated the labor overhead to be 330%, a figure which it describes as being "outrageously high" based on comparisons to past experience with small companies of this sort where overhead was approximately 150%.

The Army revised the estimate for several items listed on the bill of materials and increased the government estimates for some of the wiring harness kits. The government states that while in some cases this made the overall figures closer, the problem with the contractor's proposed overhead still existed. The contract specialist also attempted to obtain the manufacturing overhead assigned to the contractor's 1995 sales, but the contractor stated that it would not be an accurate reflection because its estimated sales were expected to increase from $1.3 million to $9 million in 1996. The government states that this type of calculation is a routine piece of information used in the pricing of goods and services.

In addition to the foregoing, the revised proposal did not provide a direct labor breakout in enough detail to determine the number of people, and their specific labor categories, to be assigned to the project. The Army requested this data from PCT and during a meeting held January 30, 1996, it was determined that the contractor intended to charge the entire cost of the president's salary and contract manager's salary to the contract. The Army deemed this cost to be unacceptable based on generally accepted accounting principles which dictate that these types of costs are a general and administrative expense to be spread among all the contractor's

sales. *See Town Center Management Corp. v. U.S.*, 31 Fed.Cl. 763, 767 (1994) (stating that " '[h]ome office overhead' has been interpreted by the courts to include those administrative expenses which (1) relate to the general management and conduct of the business and (2) are continuous in nature"). The contractor had also intended to hire eleven additional people for this project, including a clerk. The Army contracting officer determined that the project was not large enough to warrant such a substantial increase in personnel.

During the same meeting held January 30, 1996, PCT's representative handed the contract specialist a sheet of paper setting forth a list of equipment that he stated the contractor needed in order to perform this contract. The total cost of this equipment exceeded $110,000 and was also in excess of costs included in the contractor's proposal.

In sum, based on the foregoing discussion and other information contained in the administrative record, it is plain that the Army was extremely flexible in its dealings with the contractor. The Army extended time limits, modified the duration of the contract and modified certain of the contract terms, all in an apparent attempt to make this procurement viable for both the plaintiff and the government. Plaintiff has proffered not even a scintilla of evidence to show that the Army was anything but rational in cancelling the solicitation based in part on its conclusion that the plaintiff's proposed price was unreasonable. Accordingly, based on all the information before the court, which it has thoroughly considered, the Army's conclusion concerning the unreasonableness of the plaintiff's price proposal was rational and will not be disturbed by this court.

### D. Delivery Requirements

■ The Army also based its decision to cancel the solicitation on its determination that PCT did not adequately demonstrate that it could meet the delivery schedule. The contracting officer ascertained that the cancellation would be clearly in the government's interest, pursuant to the terms of 48 C.F.R. § 15.608(b)(4) (1995). In this case, timely delivery was critical to the Army.

Section L.0 of the RFP required PCT to submit a flow chart demonstrating how it intended to ensure timely delivery in accordance with the required delivery schedule. Plaintiff contends that the record does not indicate that the government shared the gravity of its concerns with PCT regarding PCT's ability to meet the schedule. Plaintiff states that the government "knew long before it canceled the solicitation that it was very likely that some of the delivery deadlines would not be met." Plaintiff's Opposition at 15. In support of this statement, plaintiff refers to the contracting officer's January 16, 1996 letter to PCT. It also contends that the government had a readily available alternative source to satisfy additional needs in the event Process Control was unable to meet the stringent set of deadlines under this contract.

It is clear upon reviewing the administrative record that the contractor was notified of the critical nature of timely delivery. In his January 16, 1996 letter, the contracting officer wrote to the contractor:

Delivery is a critical component of the above referenced requirement and it is necessary for the Government to see how your company intends to meet the delivery requirements of the minimum order quantity. No contract award will be made without the required flow chart set forth in section L.0.

The flow chart does not have to detail the usage of each material and supply time, but it is expected to show major events, including but not limited to contract award (start date), order for materials and supplies, start date for subassembly 1, 2, 3, etc., machine set-up start and end dates, completion date of subassemblies, completion dates for the T35, T55, etc., shipment and delivery to Corpus Christi.

It is realized that delivery of the first items may not be exactly possible by 1 May 96 due to various delays, but the submission of a flow chart will inform the Government of the most realistic completion date.

AR at 310.

Also, section F.5 of the RFP, "Time of Delivery," included a required delivery

schedule which states that delivery of the first shipment of the minimum order quantity was due not later than May 1, 1996, with second, third, and fourth shipments due, respectively, no later than July 1, 1996, September 1, 1996, and November 1, 1996. AR at 14–15. Section F.5 also states that "[o]ffers that proposed delivery that will not clearly fall within the applicable required delivery period specified above, may be considered nonresponsive and rejected." AR at 15.

Additional facts of this matter as shown in the administrative record demonstrate that the Army was rational and reasonable in deciding to cancel the solicitation at issue based, in part, on its concern that plaintiff could not meet the delivery schedule. For example, after the parties met on January 11, 1996, but prior to receipt of the cost and pricing data, the contractor was reminded to provide the flow-chart required by Section L.0. The flow chart was required to determined how the contractor intended to meet the critical delivery schedule of the minimum order quantity. PCT indicated it was unaware that this requirement existed in the solicitation. Accordingly, the Army came to suspect that PCT had not even read the entire solicitation and to doubt whether the contractor understood the critical nature of this requirement. The contractor then requested that the submission of the flow chart be delayed until after contract award. The contracting officer, in turn, sent the aforementioned letter to the contractor on January 16, 1996 which states that the flow chart had to be submitted and that without it, no award would be made.

Also, on January 18, 1996, the contractor called and stated that he would be unable to provide the required data until January 22, 1996. This led the Army to have concerns that the company would be unable to meet the required delivery dates for the physical items. The delivery schedule for the first items was set for May 1, 1996, and the program schedule was such that very little "slippage" could be tolerated. The contractor was warned that it was jeopardizing the procurement but was, nevertheless, granted the extension.

The government further came to doubt the contractor's ability to timely perform the contract when PCT indicated to the contract specialist during the January 30, 1996 meeting that in order to perform the contract it would need to (1) purchase substantial equipment; and (2) hire eleven new employees. This meeting was held only three months before the first shipment was due. The government had previously been under the impression that the contractor was ready to perform as soon as the contract was awarded, but the purchase of these additional items would lead to a delay in performance.

Through its repeated failure to meet deadlines in the context of this procurement; and the plaintiff's need to purchase significant equipment not accounted for in its proposal to perform the contract, the government reasonably came to (1) interpret the contractor's actions as indicating a lack of understanding of the importance of timely delivery; and (2) doubt the contractor's ability to perform the actual contract on schedule. And although the plaintiff does correctly point out that the government indicated in its January 16, 1996 letter that some limited variation from the planned contracting schedule could be expected, the letter was also very clear that plaintiff needed to timely submit the requisite flow chart, which plaintiff failed to do.

While the plaintiff contends that genuine issues of fact exist with respect to the critical nature of the government's delivery, it is not the role of the court, in this instance to, inquire as to the "true extent" of the critical nature of the government's needs. It is more than sufficient that the Army represented its needs as such at the outset and memorialized them as contract requirements which plaintiff was obliged to fulfill. Also, it is insignificant whether the government would have been able to meet its contracting needs via some other source in the event that plaintiff was unable to meet the stringent delivery schedule. It is sufficient here that (1) the requirements of the solicitation were clearly specified in the solicitation itself and in subsequent correspondence with the contractor; and that (2) the government reached a reasonable conclusion that plaintiff had not adequately demonstrated that it could meet

the delivery schedule. The government reasonably factored its concerns about PCT's ability to meet the critical delivery schedule into its decision to cancel the solicitation. *See All Points Int'l, Inc.,* B–243,901, 91–2 C.P.D. ¶ 129 (finding a rejection of proposal proper where the offeror's ability to meet the deliver schedule was "reasonably questionable").

### E. Discussions

The plaintiff contends that the government had a duty to negotiate with PCT in good faith and conduct meaningful discussions. Plaintiff's central argument is that the government failed to negotiate in good faith prior to cancelling the RFP because it concealed its "very specific price concerns, such as the direct charge of officer salaries, amounts included in overhead for travel and legal expenses, and PCT's labor burden rate." Plaintiff's Opposition at 11.

█ Discussions are deemed to be meaningful if "they generally lead offerors into the areas of their proposals requiring amplification or correction, which means that discussions should be as specific as practical considerations permit." *WorldTravelService v. United States,* 49 Fed.Cl. 431, 439 (2001) (quoting *Advanced Data Concepts, Inc. v. United States,* 43 Fed.Cl. 410, 422 (1999) (internal quotations and citations omitted), *aff'd,* 216 F.3d 1054 (Fed.Cir.2000)). Ultimately, both the decision to conduct discussions and the scope of any discussions are left to the judgment of the contracting officer. *Id.* (citing *Labat–Anderson v. United States,* 42 Fed.Cl. 806, 834 (1999)). Contrary to PCT's assumption, " 'agencies are not obligated to conduct all-encompassing discussions, that is, to address in express detail all inferior or inadequate aspects of a proposal.' " *Labat–Anderson,* 42 Fed.Cl. at 835 (citation omitted). Thus, an agency's advice to an offeror "that its prices [are] higher than the government's estimate satisfie[s] the requirement for meaningful discussion." *GeoMet Data Servs., Inc.,* B–242,914, B–242,-914.4, 71 Comp. Gen. 302; accord *Northwest Reg'l Educ. Lab.,* B–213,464, 84–1 CPD ¶ 357.

█ In support of its argument that the government failed to conduct meaningful discussions in this matter, plaintiff cites to numerous General Accounting Office decisions that stand for the proposition that the government is not prohibited from quantifying its cost concerns. These decisions do not, as plaintiff contends, stand for the proposition that the government must identify each cost element that the government believes is excessive and articulate by how much it is excessive. *See Steinhoff & Sadler, Inc.,* 1992 WL 63459, B–246,604, B–246,604.3 (stating that the agency is "not prohibited" from quantifying price-related concerns); *Newport News Shipbuilding and Drydock Co.,* B–254,969, et al., 94–1 CPD ¶ 198 (stating that it is not improper for the agency to disclose that certain cost elements were unrealistically low); *Racal Guardata, Inc.,* B–245,139, B–245,139.2, 92–1 CPD ¶ 159 (stating that it is not improper for the agency to disclose specific price objectives). Therefore, these cases do not support plaintiff's argument.

█ Significantly, despite plaintiff's protestations to the contrary, the administrative record reflects the adequacy of the discussions held between the government and the contractor. The record demonstrates that the government told PCT that its prices were extremely high in comparison to the government estimate and instructed PCT to review its costs. AR at 396 ¶ 5. Furthermore, the government repeatedly identified deficiencies in PCT's cost data and gave PCT numerous opportunities to review its proposal. AR at 230, 303, 310, 326, 370, 392 ¶ 4, 393 ¶¶ 9–10, 395–96 ¶¶ 3–5, 397 ¶¶ 10–11. The government's discussions with PCT regarding PCT's price (which exceeded the government estimate by 175%) were adequate. Thus, there is not a genuine issue of material fact as to whether the government discussed in specific detail with plaintiff: (1) its concerns regarding plaintiff's proposal to purchase significant new equipment and machinery and hire new employees; (2) its concerns over the allocation of the compensation of PCT's president, who was also the project manager for the contract; (3) the proposed labor burden rate with PCT; or (4) a quantification of its pricing concerns.

Also, as discussed *supra* in conjunction with the section regarding the government's conclusion that plaintiff did not adequately demonstrate its ability to meet the schedule, the government made it abundantly clear to plaintiff in the solicitation and in subsequent correspondence that it was required to submit a flow chart and that its proposal would be rejected absent the flow chart. *See Cube Corp. v. United States*, 46 Fed.Cl. 368 (2000) (stating that "[w]hen the solicitation clearly calls for the items in question, as here, it is not incumbent on the government to unduly assist or 'spoon-feed' an offeror"). *See also Dynamic Sys. Technologies, Inc.*, B–253,957, 93-2 CPD ¶ 158 (stating that "an agency is not required to remind an offeror to submit information with its final offer when that information is specifically called for in the solicitation"). Nevertheless, on January 12, 1996, the contract specialist reminded PCT that, pursuant to Section L.0 of the RFP, PCT had to submit a flow chart indicating how it intended to ensure timely delivery.

Thus, it follows from an examination of the record that the government engaged in significant and ample discussions with plaintiff. And because the record reflects the adequacy of the discussions, there are no genuine issues of material fact concerning additional specifics of the meetings, discussions, and content thereof.

### F. Alleged Disparate Treatment of PCT

Plaintiff contends that even though the government previously had an existing contract with Lockheed for the same items that are the subject of the current solicitation on a cost-plus-award-fee-basis, it would not enter into the same arrangement with PCT, and therefore there is a genuine issue of material fact regarding the reasonableness and basis for the government's refusal to accord PCT the same treatment with respect to price escalation that it had afforded Lockheed.

Government officials are presumed to act conscientiously and in good faith in the discharge of their duties. *Asco–Falcon II Shipping Company, et al. v. United States*, 32 Fed.Cl. 595, 604 (1994). Thus, "in order for this court to find that defendant breached its *duty* of good faith, plaintiffs must *allege and prove*, by clear and strong evidence specific acts of bad faith on the part of the government." *Id.* (citation omitted) (emphasis in original). Indeed, it requires "well nigh irrefragable proof" to establish that the government acted in bad faith. *Kalvar Corp. v. United States*, 543 F.2d 1298, 1301, 211 Ct. Cl. 192 (1976). Furthermore, a "bland allegation of disparate treatment does not, *ipso facto*, state an actionable claim. Plaintiffs must· show a breach of a contractual obligation." *Asco–Falcon II*, 32 Fed.Cl. at· 604. *See also The Libertatia Associates, Inc. v. United States*, 46 Fed.Cl. 702, n. 9 (2000).

In this matter, plaintiff does not contend that the Army acted in bad faith, nor has it pointed to any evidence that is even suggestive of bad faith conduct. Accordingly, there is no genuine issue of material fact regarding the Army's allegedly disparate treatment of Process Control.

### CONCLUSION

For the foregoing reasons, it is hereby **ORDERED:**

(1) Defendant's Motion for Judgment Upon the Administrative Record, filed February 17, 2000 is **GRANTED**;

(2) The Clerk is directed to enter final judgment dismissing the complaint in this action; and

(3) Each party to bear its own costs.