**BANKNOTE CORPORATION OF AMERICA, INC., and Guilford Gravure, Inc. Plaintiffs,**

v.

**The UNITED STATES, Defendant,**

v.

**Sennett Security Products, LLC, Avery Dennison Corporation, Inc., and Ashton–Potter (USA), Ltd., Intervenors.**

Nos. 03–709C, 3–761C.

United States Court of Federal Claims.

Filed Under Seal: May 9, 2003.

Reissued: May 14, 2003.[1]

1. An unredacted version of this opinion was issued under seal on May 9, 2003. The opinion issued today incorporates the parties' jointly proposed redactions. This redacted material is represented by brackets [ ].

Hopewell H. Darnielle, III, Thompson Coburn, LLP, Washington, D.C., for plaintiff, Banknote Corporation of America, Inc.

Michael J. Schaengold, Patton Boggs, LLP, Washington, D.C., for plaintiff, Guilford Gravure, Inc.

Timothy P. McIlmail, U.S. Department of Justice, Washington, D.C., with whom was Assistant Attorney General Robert D. McCullum, Jr., for defendant.

David P. Hendel, Wickwire Gavin, PC, Vienna, VA, for intervenor, Avery Dennison Corporation.

Raymond R. Fioravanit, Epstein, Becker & Green, PC, Washington, D.C., for intervenor, Ashton–Potter (USA) Ltd.

James C. Fontana, Law Office of James C. Fontana, Cenreville, VA, for intervenor, Sennett Security Products, LLC.

## OPINION

ALLEGRA, Judge.

This post-award bid protest action is before the court on the parties' cross-motions for judgment on the administrative record. Briefly, these consolidated cases are brought by plaintiffs, Banknote Corp of America Inc. (BCA) and Guilford Gravure, Inc. (Guilford), to challenge the March 21, 2003, decision by the U.S. Postal Service (the Postal Service) to award to other contractors three long-term task-order contracts for the production

of U.S. postage stamps pursuant to Solicitation No. 102590–02–A–0046. This procurement is referred to as "Multi–Print III" (MPIII) because it represents the third global competitive procurement conducted by the Postal Service for the production of U.S. postage stamps. The three challenged contract awards were made to Sennett Security Products, LLC (Sennett), Avery Dennison Corporation, Inc. (Avery) and Ashton–Potter (USA), Ltd (Ashton–Potter), each of whom has been granted intervenor status in these cases. BCA and Guilford seek various forms of declaratory and permanent injunctive relief.

BCA filed its complaint in this matter on April 4, 2003; Guilford filed its complaint on April 10, 2003, and the case were immediately consolidated. On April 14, 2003, this court denied plaintiffs' application for a temporary restraining order. However, at the urging of all parties concerned and given the importance of the contracts at issue, the court agreed to expedite its ruling on permanent injunctive relief and, toward that end, adopted an aggressive briefing schedule under which the parties filed cross-motions for judgment on the administrative record and three sets of briefs between April 23, 2003, and May 1, 2003. On May 2, 2003, this court conducted oral argument on the cross-motions, at the conclusion of which, as previously promised to the parties, it rendered an oral ruling. That ruling denied plaintiffs' motions for judgment on the administrative record and granted defendant's cross-motion for such judgment, obliging this court further to conclude that granting the requested relief was inappropriate. While the court orally described the rationale for its ruling, it indicated that, notwithstanding an impending trial in New Orleans, Louisiana, it would endeavor to issue, by no later than May 9, 2003, a written ruling in this matter. This, of course, is that ruling.

We begin with common ground. In a bid protest case, this court will enjoin the government only where an agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) (1994). *See also* 28 U.S.C. § 1491(b)(4) (1994 & Supp. V 2000).

By its very definition, this standard recognizes the possibility that there exists a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which "consider[s] the relevant factors" and is "within the bounds of reasoned decisionmaking." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). Accordingly, this court will interfere with the government procurement process "only in extremely limited circumstances." *CACI, Inc.– Federal v. United States,* 719 F.2d 1567, 1581 (Fed.Cir.1983) (quoting *United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1372 (Fed.Cir.1983)). Indeed, a protestor's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where, as here, the procurement is a "best-value" procurement. *See Mangi Envtl. Group, Inc. v. United States,* 47 Fed.Cl. 10, 15 (2000); *see also TRW, Inc. v. Unisys Corp.,* 98 F.3d 1325, 1327–28 (Fed.Cir.1996); *LaBarge Prods., Inc. v. West,* 46 F.3d 1547, 1555 (Fed. Cir.1995) (citing *Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 617 F.2d 590, 597–98 (1980)).

It is the burden of the aggrieved offeror to demonstrate that the challenged agency decision is either irrational or involved a clear violation of applicable statutes and regulations. *See Seattle Security Servs., Inc. v. United States,* 45 Fed.Cl. 560, 566 (2000); *Analytical & Research Tech., Inc. v. United States,* 39 Fed.Cl. 34, 42 (1997); *Aero Corp. v. United States,* 38 Fed.Cl. 739, 749 (1997). Further, "to prevail in a protest the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data General Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996). To demonstrate prejudice, "the protestor must show 'that there was a substantial chance it would have received the contract award but for that error.'" *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999) (quoting *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1582 (Fed.Cir. 1996)). Finally, because injunctive relief is so drastic in nature, a plaintiff must demon-

strate that its right to such relief is clear. *See Seattle Security Servs., Inc.,* 45 Fed.Cl. at 566; *cf. Beta Analytics Int'l., Inc. v. United States,* 44 Fed.Cl. 131, 137 (1999).

Against this familiar legal backdrop, plaintiffs mount a seven-part challenge to the Postal Service's award decision here. The court will discuss each theory for reversing the award decision *seriatim,* describing, as it goes, any facts necessary to the resolution of these matters.[2]

■ At the outset, BCA contends that the Postal Service's evaluation of its proposal was irrational because it ignored critical information that BCA either provided in its various submissions or made available for the Postal Service's review. In evaluating this issue, as well as certain others to be discussed hereinafter, this court is mindful that "[t]he determination of the relative merits of proposals is the responsibility of the procuring agency since it must bear the burden of any difficulties incurred by reason of a defective evaluation." *Biological Monitoring, Inc.,* 83–1 C.P.D. ¶ 395 at 2, 1983 WL 26711 (1983); *see also Arctic Slope World Services, Inc.,* 2000 C.P.D. ¶ 75 at 4, 2000 WL 675594 (2000). In protests challenging an agency's evaluations of an offeror's technical proposal and past performance, review thus should be limited to determining whether the evaluation was reasonable, consistent with the stated evaluation criteria and complied with relevant statutory and regulatory requirements. *See, e.g., Infrared Technologies Corp.,* 99–2 C.P.D. ¶ 41 at 3, 1999 WL 688114 (1999) (evaluation of technical proposals); *Rohmann Servs., Inc.,* 98–2 C.P.D. ¶ 134 at 3, 1998 WL 840924 (1998) (evaluation of past performance).

■ A review of the record indicates that, on each of the critical points raised by BCA, the Postal Service did not ignore the information presented by BCA, but rather fully evaluated that information and, as a result, discounted it. For example, BCA takes issue with various concerns raised by the Postal Service with respect to [ ], [ ], which had

never before printed postage stamps. But, a review of the administrative record demonstrates that these concerns were far from unreasonable and were based not only upon [ ]'s total lack of experience in printing stamps, but also other indicia, such as comments made during a site visit by a key [ ] employee suggesting a lack of familiarity with published Postal Service printing specifications. Along these same lines, while BCA claims that the Postal Service ignored that [ ] was ISO 9002 certified, the record reflects that this fact was fully considered, albeit not with the weight that BCA would like. In similar vein, BCA contests the Postal Service's finding that it would have a large learning curve regarding new coiling equipment and require strong oversight from the Postal Service. Not so, BCA claims, suggesting that the Postal Service ignored the equipment it had installed and other equipment that was on order. *Per contra.* A review of the administrative record reveals that the Postal Service was well aware of this equipment, noting, for example, specific concerns regarding [ ].

Ultimately, all of the claims made by BCA on this first issue fall into one of three categories: (i) factual assertions that simply are not borne out by the record—for example, BCA's unsupported claim that it was commended by the Postal Service for its allegedly low [ ]; (ii) assertions that involve disagreements with the judgments of the Postal Service, which judgments this court can readily verify were correct—for example, apparent inadequacies in BCA's [ ]; and, finally, (iii) assertions that involve disagreements with the judgment of the Postal Service on highly technical matters, which, based on the record, this court is in no position to second-guess. *See E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir.1996) (noting that such technical decisions are the "minutiae of the procurement process ... which involve discretionary determinations of procurement officials that a court will not second guess"). As to all these matters, BCA has failed to show that the Postal Service ignored relevant material or rendered findings that were un-

2. Due to the press of time and the expedited nature of this opinion, the court is unable to provide a detailed summary of the background

facts in this matter. All critical facts, however, are referenced herein.

reasonable or arbitrary. As such, there is no basis whatsoever for this court to substitute its judgment for that of the procuring agency.

■ Turning to the next ground of contention, both plaintiffs assert that the Postal Service improperly accepted for award proposals that failed to conform to material requirements of the Solicitation. In essence, plaintiffs claim that each of the three awardees thus failed to meet certain so-called "mandatory minimum requirements." So-called "mandatory minimum requirements" are essentially pass/fail in nature and may lead to the outright rejection of a proposal that falls short of what they specify. In determining whether such a requirement is present, this court must interpret the solicitation as a whole, wherever possible giving effect to the plain meaning of each word, clause or sentence. See Northrop Grumman Corp. v. Goldin, 136 F.3d 1479, 1483 (Fed. Cir.1998); Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed.Cir.1991); Anderson Columbia Envtl., Inc. v. United States, 43 Fed.Cl. 693, 698 (1999). This court has repeatedly held that a mandatory minimum requirement must be clearly identified as such within the solicitation so as to "put offerors on notice" of the serious consequences of failing to meet the requirement. Isratex, Inc. v. United States, 25 Cl.Ct. 223, 229 (1992). See also Cubic Def. Sys., Inc. v. United States, 45 Fed.Cl. 450, 460 (1999). As discussed by this court in ManTech Telecomms. and Info Sys. Corp. v. United States,

49 Fed.Cl. 57, 67 (2001), aff'd, 2002 WL 418168 (Fed. Cir. Mar 18, 2002), and Isratex, Inc., 25 Cl.Ct. at 229–30, language used to provide such notice typically emphasizes that a proposal must meet the requirement in order to be eligible for evaluation or, conversely, that failure to comply with the requirement will lead to outright rejection of the proposal.[3]

■ In the case sub judice, the requirements identified by plaintiffs are not mandatory minimum requirements. There is no hint in the Solicitation that the failure to meet these requirements would lead to the immediate exclusion of entire proposal from the competition. Rather, taken as a whole and viewed in context, the provisions in question merely suggest that the extent of an offeror's compliance therewith will be numerically rated; there is no indication that such ratings will be preceded by a "go/no go" decision. As such, these provisions differ fundamentally from clauses establishing mandatory minimum requirements in other solicitations, which state explicitly that a proposal's compliance with the specified experience requirements will first be rated on "go/no go" basis and then, if and only if meeting such requirements, be subjected to an numerical or adjectival evaluation.[4] Indeed, at least at one point in the Solicitation, the Postal Service made clear that certain prescribed conduct would lead to the rejection of a proposal, indicating that "[p]roposals that merely offer to conduct a program in

**3.** See, e.g., International Bus. Machs. Corp., GSBCA No. 9293–P, 88–1 B.C.A. ¶ 20,512, at 103,697, 1988 WL 44208 ("Proposals ... shall meet all the [G]overnment's requirements in Section C in order to be eligible for evaluation."); Spectragraphics Corp., GSBCA No. 9194–P, 88–1 B.C.A. ¶ 20,333, at 102,786, 1987 WL 46036 (where the RFP stated, "[t]he Government shall not consider for award proposals that do not meet the mandatory requirements"); CPT Corp., GSBCA No. 8134–P–R, 86–1 B.C.A. ¶ 18,727, at 94,206, 1986 WL 19610 (RFP stating, "[i]n order to have an acceptable proposal, the offeror must meet all of the mandatory requirements set forth in Section C.2 of the Solicitation Document").

**4.** See, e.g., Zenith Data Systems, Inc., P.S. Protest Nos. 95–19, 95–20 (Nov. 22, 1995) ("All proposals will first be evaluated to determine if the proposal minimally meets all mandatory requirements (go/no go). Any offeror's proposal not

minimally meeting a mandatory requirement will not be evaluated further."); George Hyman Constr. Co., 95–2 C.P.D. ¶ 173, at 3–5 (1995) (referring to "minimum acceptable past experience" as a "go/no go" requirement; proposals meeting this requirement would then be rated); Amtec Corp., 95–2 C.P.D. ¶ 164, at 3, 1995 WL 578228 (1995) (same); George A. Fuller Co., 92–1 C.P.D. ¶ 433, at 2, 1992 WL 108946 (1992) (same); Contract Servs. Co., Inc., 92–1 C.P.D. ¶ 427, at 4, 1992 WL 108952 (1992) (same). Compare Mangi Envtl. Group, Inc., 47 Fed.Cl. at 16 (holding identification of personnel requirement mandatory, but not the provision of resumes for such individuals, where solicitation indicated that proposals failing to provide, at a minimum, the names and proposed duties of the specified individuals "will be considered unacceptable and will not be considered further").

accordance with the requirements of the Postal Service's statement of work will not be eligible for an award." As this court noted in *ManTech,* 49 Fed.Cl. at 68 n. 18 and *Isratex, Inc.,* 25 Cl.Ct. at 229–30, the presence of such mandatory minimum language in one section of a solicitation but not in another must be presumed to have been purposeful and provides a strong indication that the latter provision is not a mandatory minimum requirement. Thus, the court concludes that the Postal Service's interpretation of the Solicitation appropriately did not require any of the awardees' exclusion from the competition.

Moreover, it should be noted that it does not appear that the awardees actually violated any of the subject requirements. Take, for example, plaintiffs' banner claim that neither [ ] nor [ ] possessed the capability of printing in 10 colors [ ]. Nothing in the Solicitation required that this capacity be present at the time proposals were submitted or the contracts were awarded. Rather, it appears that the offerors were evaluated based upon the appropriateness and feasibility of their timetable for developing the 10–color capability. Indeed, in asserting that [ ] and [ ] not only lacked this 10–color capability, but also the ability to [ ], both plaintiffs turn a blind eye to the current capacity offered by these awardees' subcontractors and to several indications that the Postal Service believed that the 10–color capability could be offered by [ ].[5] Several of the other alleged deficiencies asserted by plaintiffs also either are not borne out by the record, for example, the claim that [ ] lacked the capability to print [ ], or involve deficiencies of the sort which this court in *ManTech,* 49 Fed.Cl. at 69, recognized could be corrected after submissions but prior to an actual award. *See also SMS Data Products Group Inc. v. Austin,* 940 F.2d 1514, 1517 (Fed.Cir.1991); *AmClyde Engineered Products Co., Inc.,* 99–2 C.P.D. ¶ 5, 1999 WL 491902 (1999). The latter, for example, is the case with respect to a subcontracting plan required by the Solicitation that was provided by [ ] shortly before the award.

In the next prong of their assault, plaintiffs argue that the Postal Service improperly treated the offerors disparately in evaluating the technical proposals here. On this count, it is beyond peradventure that a contracting agency must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria. *See Seattle Sec. Services,* 45 Fed.Cl. at 569 (citing cases). Contrary to plaintiffs' claims, the court does not find any evidence—let alone clear evidence—that the Postal Service acted unfairly or irrationally in evaluating the plaintiffs' offers.

On this count, BCA's primary claim is that it was downgraded for deficiencies relating to its use of [ ], [ ], while other awardees were not downgraded for proposing subcontractors which also lacked postage stamp experience. Again, however, the record does not bear out the root factual premises underlying this claim. For example, the record reveals that [ ]'s gravure subcontractor, [ ], had printed stamps for the Postal Service for approximately [ ] years prior to [ ] and was the same subcontractor that [ ] had employed in a prior Postal Service contract [ ]. Similarly, [ ]'s three main subcontractors for gravure and intaglio printing—[ ]—all had extensive experience [ ]. And while a fourth [ ] subcontractor, [ ], admittedly lacked stamp experience, according to [ ]'s proposal, it was offered for offset printing [ ]. Accordingly, on this issue, there are no close parallels between BCA's proposals and those of [ ], and certainly no basis for this court to disturb the distinctions drawn between these proposals by the Postal Service.

The same is generally true of BCA's bald assertion that it was severely penalized for problems encountered under prior contracts, while [ ] was not. In fact, the administrative record includes several letters in which the Postal Service [ ]: [ ]. There is no indication in the administrative record that these [ ] were unwarranted. Nor is there any evidence that [ ] experienced anywhere near the same number or magnitude [ ] as BCA. And, there is affirmative evidence suggesting that

---

5. Although it now professes otherwise, BCA apparently was previously aware that certain stamps could be produced by [ ], as it proposal

offered such an approach for printing certain stamp products.

[ ]'s lesser deduction may also have reflected offsetting strengths, for example, a Quality Supply Award it received from the Postal Service in 1999.

As to these points and others raised under this same rubric, BCA offers little more than its disagreements with the Postal Service's overall assessment of the adequacy of its proposal versus that of its competitors. Such naked claims, no matter how vigorous, fall far short of meeting the heavy burden of demonstrating that the findings in question were the product of an irrational process and hence were arbitrary and capricious. *See Carlson Wagonlit Travel,* 2001 C.P.D. ¶ 49 at 2, 2001 WL 254317 (2001) ("an offeror's mere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish that the agency acted unreasonably"); *PEMCO World Air Servs.,* 2000 C.P.D. ¶ 71 at 9, 2000 WL 546803 (same); *see also JWK Int'l Corp. v. United States,* 52 Fed.Cl. 650, 660 (2002), *aff'd,* 2003 WL 344100 (Fed.Cir.2003). Moreover, even if many of BCA's assertions were true, they would produce either negligible increases in its technical score or, correspondingly, negligible decreases in the scores of its competitors—generating a theoretical impact far less than what would be required to bring BCA within the realm of any likelihood of receiving an award.[6] Thus, BCA's claims on this count fail for an additional reason, that is, lack of prejudice.

■ With an eye ultimately toward upsetting the Postal Service cost/technical trade-off, Guilford's basic claim under this heading is that its technical proposal should have been rated even higher and [ ]'s proposal should have been rated lower, thereby increasing the spread between the two proposals. But that assertion yet again boils down

to little more than mere disagreement with the agency's judgment on various points and thus misses the mark essentially for the same reasons discussed above. Worse still, in making assertions in support of this claim, Guilford inappropriately relies on unverified information that was not before the Postal Service and that this court, for reasons stated elsewhere, has refused to include in the administrative record. Accordingly, this court rejects Guilford's claims regarding the evaluation of its and [ ]'s technical evaluations.

■ Next, plaintiffs both maintain that the Postal Service failed to engage in meaningful discussions and, indeed, engaged in unequal communications among the offerors. In negotiated procurements, agencies are required to conduct meaningful discussions with offerors in the competitive range. *See Arthur Anderson & Co.,* 92–1 C.P.D. ¶ 168, 1992 WL 30869 (1992). Discussions are deemed to be meaningful if "they generally lead offerors into the areas of their proposals requiring amplification or correction, which means that discussions should be as specific as practical considerations permit." *WorldTravelService v. United States,* 49 Fed.Cl. 431, 439 (2001) (quoting *Advanced Data Concepts, Inc. v. United States,* 43 Fed.Cl. 410, 422 (1999) (internal quotations and citations omitted), *aff'd,* 216 F.3d 1054 (Fed.Cir.2000)); *see also Process Control Tech. v. United States,* 53 Fed.Cl. 71, 81 (2002). Ultimately, both the decision to conduct discussions and the scope of any discussions are left to the judgment of the contracting officer. *Id.*

■ Here, plaintiffs complain that the Postal Service conducted inadequate discussions regarding their prices—note, at the outset, Guilford's and BCA's prices were, respectively, [ ] and [ ].[7] Plaintiffs essentially

---

6. The following chart summarizes the Postal Service's evaluation of the offerors' technical proposals. As can be seen, BCA ranked [ ]—

| Contractor | Points | [ ] |
|---|---|---|
| [ ] | [ ] | [ ] |
| [ ] | [ ] | [ ] |
| [ ] | [ ] | [ ] |
| [ ] | [ ] | [ ] |
| [ ] | [ ] | [ ] |

7. The following chart shows the evaluated price of each proposal, as well as the differential between that price and the lowest-priced proposal (that of [ ]):

| Contractor | [ ] | [ ] |
|---|---|---|
| [ ] | [ ] | [ ] |
| [ ] | [ ] | [ ] |
| [ ] | [ ] | [ ] |
| [ ] | [ ] | [ ] |
| [ ] | [ ] | [ ] |

claim that the Postal Service erred in discussing some, but not all, of their prices on the items covered by the contract. Initially, the court notes that it is well-accepted that "'agencies are not obligated to conduct all-encompassing discussions, that is, to address in express detail all inferior or inadequate aspects of a proposal.'" *Labat–Anderson, Inc. v. United States*, 42 Fed.Cl. 806, 835 (1999) (citation omitted). More specifically, various decisions hold that although an agency may inform an offeror during discussions that its cost or price is considered to be too high or unrealistic, the government has no responsibility to inform an offeror that its cost or price is high where the offeror's cost or price is not considered excessive or unreasonable. *See, e.g., Triangle Maintenance Corporation*, 94–1 C.P.D. ¶ 267, 1994 WL 148267 (1994); *Weeks Marine, Inc./Bean Dredging Corp., a Joint Venture*, 89–2 C.P.D. ¶ 505, 1989 WL 237553 (1989); *Applied Remote Technology, Inc.*, 93–1 C.P.D. ¶ 58, 1993 WL 17595 (1993); *Warren Elec. Constr. Corp.*, 90–2 C.P.D. ¶ 34, 1990 WL 278246 (1990). While these decisions construe the FAR, their application to section 4.2.5.c of the Postal Service's Purchasing Manual ("PM") seems appropriate as the latter's provisions are analogous to the FAR's rules on discussions. Tested by the standards mapped in the case law, there is no indication in the administrative record that the Postal Service considered either BCA's or Guilford's price excessive or unreasonable, and hence no obligation that the discussions here needed to address those prices to be meaningful.

A few additional observations on this issue are warranted. In evaluating the proposals, the Postal Service grouped its various products into three tiers—the offerors did not know about these tiers until after the award. The Postal Service conducted discussions with each offeror regarding the prices originally proposed for the items in the first two of these tiers, based on its belief that these items would represent [ ] percent of the stamp program. It did not discuss with any of the offerors their prices on the third tier of products, which while representing only [ ] percent of the products in the program, af-

fected a much greater percentage of the evaluated price (in some cases, approaching 50 percent). Both BCA and Guilford vigorously assail the Postal Service's decision not to discuss their prices on the items corresponding to this undisclosed third tier. However, there are several problems with this contention:

— First, no case suggests that the Postal Service was required to go item-by-item through the entire price list. *See Process Control Tech.*, 53 Fed.Cl. at 81 (noting that an agency need not "identify each cost element that the government believes is excessive and articulate by how much it is excessive"). This court cannot say that the Postal Service acted arbitrarily in discussing the prices of the products in the first two tiers, but not those in the third, based on its view that the former, which represented [ ] percent of the stamp program, were more important in obtaining the "best value" to the government.

— Second, it should not be overlooked that at the end of these discussions, the offerors were told that they could amend "any, all or none" of their pricing and that two of the offerors—including Guilford—reduced their prices on the undiscussed tier 3 products. The latter fact indicates that while the Postal Service specifically dealt with certain products, its discussions generally pointed the offerors to an area of their offers that required massaging—namely, the price.

— Third, and relatedly, there is no reliable indication in the record that the Postal Service misled either plaintiff into thinking that their prices on the undiscussed products were competitive. Indeed, while silence is sometimes golden, it was just as reasonable for plaintiffs to question the prices on all their products based on the concerns expressed regarding the first two tiers of products, particularly since plaintiffs knew that the overall evaluated price for all the products

would be important to the award decision. *See, e.g., WorldTravelService,* 49 Fed.Cl. at 439–40; *The Communities Group,* 99–2 C.P.D. ¶ 101[, 1999 WL 1132149] (1999). Moreover, a contrary ruling on this point would be to suggest—against the weight of precedent—that if an agency discusses the prices of some items with an offeror, it must, so as not to mislead, discuss all of them.

— Fourth, and perhaps most damning, neither plaintiff has shown that they were prejudiced by the Postal Service's alleged error. While both have blithely claimed that they would have reduced the prices on their tier 3 products significantly had those products been discussed, neither has provided any real proof of this. Indeed, most of the price spread between plaintiffs and [ ], the third-highest priced awardee, was attributable to the latter [ ]. This strongly militates against this court assuming that had the products in tier 3 also been discussed, plaintiffs would have [ ].

Based on these points, this court is left with the firm conviction that the Postal Service did not err in conducting discussions here—and, to cinch matters, assuming there was an error, it most certainly was not prejudicial.

The court likewise rejects two other claims made by BCA regarding discussions. Thus, BCA asseverates that it was prejudiced because, unlike the other offerors, it was not informed that the Postal Service intended to eliminate single-sided booklets of stamps in favor of doublesided booklets. But, the record does not suggest that any offeror was told this; instead, it reveals that all the offerors were informed that demand was expected to shift from single-sided to double-sided books. Certainly, BCA was aware of this, as its revised pricing proposal admitted that its "[ ]." The court also refuses to consider BCA's claim that the Postal Service violated its Purchasing Manual by not affording BCA the opportunity to revise its technical proposal in response to various discussions. *See* PM § 4.2.5.c.3.(c). In the court's view, this point should have been apparent to BCA,

an experienced Postal Service contractor, prior to the award herein and thus should have been raised then, rather than after BCA's offer proved unsuccessful. In short, this objection was waived. *See Razorcom Teleph & Net, LLC v. United States,* 56 Fed.Cl. 140 (2003); *see also ABF Freight System, Inc. v. United States,* 55 Fed.Cl. 392, 399 (2003); *N.C. Div. of Servs. for Blind v. United States,* 53 Fed.Cl. 147, 165 (2002), *aff'd,* 60 Fed.Appx. 826 (Fed.Cir.2003); *Cubic Defense Systems, Inc. v. United States,* 45 Fed.Cl. 450, 461 (1999); *Aerolease Long Beach v. United States,* 31 Fed.Cl. 342, 358 (1994), *aff'd,* 39 F.3d 1198 (Fed.Cir.1994). Still other assertions made by BCA in this regard—for example, that it was misled into thinking that its use of [ ] would not lower its technical rating—are flatly contradicted by the record.

As another ground for overturning the award here, plaintiffs urge that the Solicitation was inherently misleading and that the Postal Service relied upon unstated evaluation criteria in rating the proposals here. It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation. This requirement is firmly rooted in the Competition in Contracting Act (CICA) and the Postal Service's Purchasing Manual, both of which indicate that an agency shall evaluate competitive proposals and assess their qualities solely on the factors and subfactors specified in the solicitation. *See* 10 U.S.C. §§ 2305(a)(2)(A), 2305(a)(3)(A) (2000); PM § 4.2.5.a. It thus is beyond peradventure that the government may not rely upon undisclosed evaluation criteria in evaluating proposals, *Acra, Inc. v. United States,* 44 Fed. Cl. 288, 293 (1999), and, where appropriate, must disclose the factors' relative importance, *Isratex, Inc. v. United States,* 25 Cl. Ct. 223, 230 (1992). *See also Cube Corp. v. United States,* 46 Fed.Cl. 368, 377 (2000); *Dubinsky v. United States,* 43 Fed.Cl. 243, 266 (1999). That said, an agency still has "great discretion in determining the scope of an evaluation factor." *Forestry Surveys and Data v. United States,* 44 Fed.Cl. 493, 499 (1999) (citing John Cibinic Jr. & Ralph C. Nash Jr., Formation of Government Contracts 830 (3rd ed.1998)). Consistent with

these precepts, in a case such as this, a protester must show that: (i) the procuring agency used a significantly different basis in evaluating the proposals than was disclosed; and (ii) the protester was prejudiced as a result—that it had a substantial chance to receive the contract award but for that error.[8] Plaintiffs have failed on both counts.

■ For example, Guilford alleges that its technical proposal should not have been downgraded due to its lack of experience as a prime contractor, suggesting that the Postal Service's reliance on prime contracting experience was an undisclosed evaluation factor. Yet, the Solicitation clearly provided that in reviewing an offeror's past performance, the Postal Service would look to contracts and subcontracts "similar in nature." Even if the contract had not so provided, the Postal Service still would have been entitled to consider generically an offeror's experience in performing the specific tasks that were the subject of the procurement. *See, e.g. Maintenance Engineers v. United States,* 50 Fed.Cl. 399, 416 (2001) (holding that subfactor in solicitation for landscaping indicating agency would review "[s]pecific grounds experience and past performance" was adequate to alert offerors that experience with similar projects would lead to higher rating). Indeed, it is well-settled that "a solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors." *Analytical & Research Tech., Inc. v. United States,* 39 Fed.Cl. 34, 45 (1997); *see also Computer Sciences Corp. v. United States,* 51 Fed.Cl. 297, 309 (2002); *Bean Stuyvesant,* 48 Fed. Cl. at 321; *T & S Products, Inc. v. United States,* 48 Fed.Cl. 100, 105 (2000). These cases make plain that, in evaluating Guilford's experience, the Postal Service did not improperly deviate from the Solicitation's evaluation factors.

For its part, BCA focuses yet again on the tiers that were used by the Postal Service to group, for at least some purposes, the prod-ucts to be ordered under the contract. BCA claims that the forecasted product mix in the Solicitation had no relationship to these tiers and that this led to an unwarranted escalation of its price. Plainly, though, BCA attaches unwarranted significance to this forecast. As a threshold matter, the Solicitation in no way indicates that the Postal Service intended offerors to calibrate their price proposals to this forecast. Rather, it caveated that the table of stamp needs was intended to serve only "reference purposes" and warned that "[t]he information contained in this table does not constitute a guarantee of the number and volumes of stamps to be ordered by the U.S. Postal Service in any of the base years of an award." Further divorcing the pricing process from the stamp table, the Solicitation also emphasized that offerors were to "present their best price proposals" as "aggressively as they deem appropriate" and affirmatively indicated that pricing should be based upon a defined "standard order volume," *i.e.,* the volume for each stamp product that corresponded to the most likely quantity to be ordered. Indeed, the talismanic precision attached by BCA to the forecasted product mix is also belied by the fact that this Solicitation was for indefinite-delivery, indefinite quantity contracts—precisely the type of contract that the government employs when it does not know the quantities it will be ordering over time. Consistent with the Solicitation, the Postal Service evaluated each offeror's price by calculating a single weighted price based upon the likelihood that the Service would order the standard order volume or any of the other volumes listed in the price table. The tiers cited by BCA played no role in this weighing process and, again, were not disclosed during the evaluation process; they merely facilitated further analysis of the overall evaluated price. In the court's view, the Postal Service's use of such tiers was intrinsic to the stated evaluation factors and

---

8. *See Bean Stuyvesant v. United States,* 48 Fed.Cl. 303, 321 (2000) ("this court may grant an offeror relief if the offeror establishes that the agency evaluated the proposal on a basis different than that announced in the solicitation and that the offeror was prejudiced as a result"); *see also ITT* *Federal Services Corp. v. United States,* 45 Fed.Cl. 174, 178 (1999); *Hydro Eng'g, Inc. v. United States,* 37 Fed.Cl. 448, 471 (1997); *CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. 718, 728 (1987), *aff'd,* 854 F.2d 464 (Fed.Cir.1988).

thus did not amount to the use of an unstated evaluation factor.

Even were this not true, BCA has failed to explain in even the broadest detail how its pricing methodology would have been different had it known about the tiers and the Postal Service's revised product forecast. Indeed, BCA's assertion that [ ] is rife with speculation and gives rise to concerns that BCA might have submitted a materially unbalanced pricing scheme, under which the prices on some items might have been significantly less than cost, while others were significantly overstated. Such an approach, of course, is prohibited. *See, e.g., Howell Constr., Inc. v. United States,* 12 Cl.Ct. 450, 453 (1987). *See also Severn Companies, Inc. et al.,* 88–2 BCA ¶ 20,689, 1988 WL 56076 (1988). In short, BCA has not demonstrated that it was prejudiced by the Postal Service's use of the tiers. BCA's other claims regarding the Postal Service's alleged use of unstated evaluation factors—for example, its contention that it was misled as to how [ ] would be rated—are addressed elsewhere herein and will not be discussed again here. Suffice it to say that the court rejects these additional claims as wholly unsupported.

As a sixth ground for overturning the award here, plaintiffs assert that the Postal Service's price evaluation methodology was arbitrary and capricious. In many ways, this basic claim merely recasts assertions already made by plaintiffs—and already rejected by this court. The only somewhat novel assertion made under this heading is Guilford's claim that the price evaluation terms of the Solicitation were unclear. Based on the observations made above, however, this court believes otherwise, particularly since Guilford's assertions of error on this count are [ ].

Plaintiffs' final argument relates to their belief that the Postal Service's best value determination here was arbitrary and capricious, and violated the Postal Service's Purchasing Manual. The Postal Service Purchasing Manual indicates that "at the heart of" a best value decision are—

(a) the trade-off judgment between price and the value offered in response to the solicitation's performance evaluation factors, (b) the relative value offered by a supplier or suppliers in relation to the competition, and (c) whether a lower cost is worth the lesser technical value (and potentially higher risk), or whether a higher price is worth the increased technical/managerial capabilities (and potentially lower risk).

PM § 4.2.5.(d)(2). As noted at the outset of this opinion, procurement officials have substantial discretion to determine which proposal represents the best value for the government. *See E.W. Bliss Co. v. United States,* 77 F.3d at 449; *Lockheed Missiles & Space Co., Inc. v. Bentsen,* 4 F.3d 955, 958–59 (Fed.Cir.1993).

Initially, both plaintiffs contend that the contracting officer inadequately documented his best value decision. The record indicates that in originally explaining his decision, the contracting officer first compared the technical and price rankings of the offerors and then described why he believed that Sennett, Avery and Ashton–Potter represented the strongest best value selections. In explaining why Guilford was not among these best value choices, he wrote:

[Guilford] maintained a[ ] profile, which was [ ] after discussions. In a reasonable judgment, the additional [ ] does not offset the offered [ ]. Given the [ ] capability and capacity at both [ ] and [ ] the program is not compelled to accept added similar capability at [ ].

Regarding BCA, the contracting officer stated that its proposal was "[ ]," noting, in particular, that "[ ]." After reciting several other perceived deficiencies in BCA's proposal, the contracting officer ultimately concluded that "[ ]." In view of these statements, together with the extensive documentation that underlies them, this court finds that plaintiffs' contention that the Postal Service failed adequately to support its best-value decision is without merit. *See WorldTravelService,* 49 Fed.Cl. at 440–41.

■ But was that decision arbitrary and capricious—and prejudiciously so? There has been much debate in this case regarding the relative weights the Solicitation afforded to technical and pricing factors. The contracting officer has admitted that, in conduct-

ing his best value determination, he weighed [ ]. Seizing on this, Guilford and BCA argue that the Solicitation, in fact, made technical factors considerably more important than price, and thus contend that the contracting officer misapplied the evaluation criteria set forth in the Solicitation.[9] Defendant agrees—to a point—admitting that technical outweighed price and that the contracting officer did not apply this weighting, although it suggests that, under the Solicitation, technical factors were only marginally more important than price. To complete the picture, the intervenors all maintain that because the Solicitation contains no specific statement as to the comparative weighting of technical and price factors that means the two factors will be treated equally. They cite a line of cases holding that "[w]here a solicitation indicates that price will be considered, without explicitly indicating the relative weight to be given to price versus technical factors, price and technical considerations will be accorded approximately equal weight and importance in the evaluation." *CardioMetrix*, 94–2 C.P.D. ¶ 191, 1994 WL 659021 (1994); *see also Logicon RDA*, 93–2 C.P.D. ¶ 179, 1993 WL 384833 (1993); *Johns Hopkins Univ.*, 89–1 C.P.D. ¶ 240, 1989 WL 240454 (1989); *Actus Corp.*, 87–1 C.P.D. ¶ 209, 1987 WL 101527 (1987).

Construing this clause in the Solicitation essentially involves contract interpretation and thus presents a question of law to be decided by this court. *See Metcalf Const. Co., Inc. v. United States*, 53 Fed.Cl. 617, 628 (2002); *see also P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed.Cir.1984). In the court's view, the language of the Solicitation does not answer the question of weighting clearly. On the one hand, consistent with plaintiffs' view and defendant's limited admission, the Evaluation Clause states that several listed technical/management factors would be the "primary areas" used in determining best value

and are listed in "descending order of importance." On the other hand, the same clause also states that in determining best value, the Postal Service will consider "a combination of price, price-related factors, and other factors."[10] Further clouding this picture, another provision in the Evaluation Factor states that "[c]ost/price will be considered in the award decision, although the award may not necessarily be made to that offeror submitting the lowest price." And while the Evaluation Clause did not expressly state the relative weights of price and other factors, it did expressly state, in regards to the listed technical/management factors, that past performance would be "weighted as more important than any other individual factor," and production capabilities and management capabilities would be "weighted equally."

A review of the cases cited by the intervenors demonstrates that the Solicitation here is, indeed, less explicit regarding the relative weight of technical versus pricing factors than other solicitations in which the relative weights of these factors has been deemed equal. For example, in *CardioMetrix, supra*, the GAO afforded technical and price approximately equal weight even though the request for proposals stated that "the [g]overnment is more concerned with obtaining superior technical features than with making an award at the lowest overall price to the [g]overnment." *Id.* The GAO came to a similar conclusion in *Actus Corp, supra*, noting that while the RFP specified the relative weights of technical factors, it did not similarly specify the relative weights of price and technical. Such, of course, is precisely the case here. Thus, this court concludes that under this Solicitation, price and technical factors were to be rated approximately equal. The contracting officer thus did not violate the Solicitation in determining best value here.

9. Parenthetically, it should be noted that in asserting that technical was "considerably" more important than price, plaintiffs rely exclusively on the purchase plan, which was not part of the Solicitation and thus is not binding on the agency. *See ManTech*, 49 Fed.Cl. at 66 n. 15.

10. Research reveals that the phrase "price-related factors" is a term of art the use of which indicated that the Postal Service intended to consider the costs, over and above the offered prices, that it would incur in the event of an award to a particular bidder. *See* Cibinic & Nash, Formation of Government Contracts, *supra*, at 613–15.

Ultimately, this court's task is to ensure that the contracting officer examined the relevant data and articulated a " 'rational connection between the facts found and the choice made.' " *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)); *see also World-TravelService,* 49 Fed.Cl. at 441. The Postal Service's best value determination met this standard. Certainly, that was the case as to BCA, which had both the [ ]—indeed, the record reveals that the contracting officer properly [ ]. Based upon the record, this court also believes that the contracting officer rationally concluded that the [ ] associated with Guilford's proposal did not warrant paying the [ ] premium associated with its offer. While Guilford presents a more plausible case on this count than BCA, the fact remains that there are numerous examples of cases in which courts have upheld best value decisions based upon price differentials considerably less than that encountered here, even where price was the least important evaluation factor. *See WorldTravel–Service,* 49 Fed.Cl. at 442–43 (summarizing cases); *ITT Federal Servs.,* 45 Fed.Cl. at 193–94; *SelRico Services,* 2002 C.P.D. ¶ 6, 2001 WL 1739147 (2001). In short, it is well-accepted that "[n]otwithstanding a solicitation's emphasis on technical merit, an agency may properly select a lower-priced, lower-technically-rated proposal if it decides that the cost premium involved in selecting a higher-rated, higher-priced proposal is not justified, given the acceptable level of technical competence available at the lower price." *Tidewater Homes Realty,* 98–2 C.P.D. ¶ 40, 1998 WL 469705 (1998); *see also Hydraulics Int'l Inc.,* 2000 C.P.D. ¶ 149, 2000 WL 1371001 (2000). In applying this rule here, the Postal Service neither acted irrationally nor contrary to the Solicitation.

Moreover, contrary to plaintiffs' claims, this court does not believe that the Postal Service violated the Solicitation in considering the fact that [ ] offered printing capabilities (*e.g.,* considerable experience with non-gravure printing) different than those of the other two awardees. In the court's view, the Solicitation, by not requiring each offeror to provide all five forms of printing, clearly envisioned that the award decision might be predicated upon the relative printing capabilities of the awardees in order to ensure that all the products needed by the Postal Service, some of which required particular types of printing, could be produced. As such, the decision of the contracting officer must be upheld.[11]

The court has considered plaintiffs' numerous other arguments and finds them also insufficient to warrant the extraordinary remedy of injunctive relief.

This court need go no farther. Based on the foregoing discussion, it concludes that the injunctive relief requested here is inappropriate because plaintiffs have not proven the merits of their claims. For the foregoing reasons, plaintiffs' motions for judgment on the administrative record are **DENIED** and defendant's cross-motion for judgment on the

---

11. As to this best value point, the court notes that its ultimate decision would not have been different had it construed the Solicitation as favoring technical factors over price. To be sure, based on such a construction, the court would have been compelled to find that the contracting officer violated the terms of the Solicitation. But, there is no indication that either plaintiff would have been prejudiced by such a result. Surely, BCA could not have complained about such a violation, as its proposal was rated [ ]—no matter how the factors were weighed, it would not have been selected. Even Guilford's case, however, would not have turned out otherwise. Certainly, the awards to [ ]—which, like Guilford had [ ], but [ ] than Guilford—would have been unaffected. And, notwithstanding the government's supposed admission of error and its apparent refusal to render, at this time, another best value determination, it remains that, as government counsel emphasized at oral argument, the Postal Service stands by its award to [ ] and by its finding that [ ]. In these circumstances, this court would not have remanded this matter to the agency for another best value determination, but rather would have determined whether correction of the error made by the contracting officer would have made a difference. *See ITT Federal Services,* 45 Fed.Cl. at 194; *see also Tech Systems Inc. v. United States,* 50 Fed.Cl. 216, 225 (2001) ("A contracting officer's best value determination is entitled to the same deference whether undertaken during the procurement or in response to litigation."). Based on the evidence here, the court believes that it would not.

administrative record in these consolidated cases is **GRANTED**. The court hereby orders the Clerk to enter judgment in both cases for defendant.

   **IT IS SO ORDERED.**