# In the United States Court of Federal Claims

No. 14-151C

(Filed: July 10, 2014)[1]

```
**************************************
                                      *
CALL HENRY, INC.,                     *
                                      *
            Plaintiff,                *
                                      *
      v.                              *
                                      *
THE UNITED STATES,                    *
                                      *
            Defendant,                *
                                      *
WOLF CREEK FEDERAL SERVICES,          *
INC.,                                 *
                                      *
            Intervenor-Defendant.     *
                                      *
**************************************
```

## OPINION AND ORDER

This post-award bid protest action was filed by Plaintiff, Call Henry, Inc. ("CHI"), on February 25, 2014, challenging the United States' (the "Government's") decision, via the National Aeronautics and Space Administration ("NASA"), to award an operation and maintenance contract for a NASA facility to Intervenor-Defendant, Wolf Creek Federal Services, Inc. ("Wolf Creek"). Also on February 25, 2014, Wolf Creek moved to intervene. The Court granted Wolf Creek's motion the following day.

On March 6, 2014, the Court granted CHI's motion for preliminary injunction and established a briefing schedule for the parties' cross-motions for judgment on the administrative record. Those cross-motions are now pending before the Court.

CHI argues essentially that Wolf Creek's proposal violated certain express terms contained in the Request for Proposals ("RFP") and that such violation was obvious on the face of the proposal. As is described in more detail below, the Court concludes that Wolf Creek's proposal did not violate any requirements of the RFP, such that NASA's award decision is upheld. Therefore, CHI's motion is DENIED and the motions of the Government and Wolf Creek are GRANTED.

---

[1] This Opinion was originally filed under seal on June 10, 2014, with instructions for the parties to confer and inform the Court of any redactions they believed necessary. On June 12, 2014, the parties informed the Court that no redactions were necessary.

## I. Background

### A. Facts

On May 7, 2013, NASA issued RFP No. NNC13ZFD017J (the "RFP"). The RFP requested proposals for "facilities operations, repair and maintenance" ("FORM II") services and duties at NASA's Glenn Research Center ("GRC"). AR 281. The RFP was divided into a two-month phase-in period, a 10-month "Contract Year 1," a 12-month "Contract Year 2," three one-year option periods (Contract Years 3-5) and a final 6-month option ("Contract Year 6"). *See* AR 8402.

The work to be performed under the RFP includes Base Work and Indefinite Delivery/Indefinite Quantity (IDIQ) work, both of which are fixed price. *Id.* All told, the Base Work formed the majority of the cost. The Independent Government Cost Estimate ("IGCE") estimated that Base Work comprised approximately 75% of the total contract price. AR 49. For both types of work, the Statement of Work ("SOW") requires the contractor to provide "labor, supervision, tools, materials, equipment, transportation, and management…" AR 282.

The SOW separated the total work into fifteen functional areas, each of which was further divided. *See* AR 283, 403-406. For example, SOW Section C.18 describes the work related to Heat, Ventilation and Air Conditioning ("HVAC"). AR 5821. The HVAC category is further subdivided into twenty duties, like "Air Handling Unit Annual [Preventative Maintenance]" or "Humidification [Preventative Maintenance]." *Id.* These categories are further divided into specific required tasks. For the Air Handling Unit Annual example, these tasks include, among other things, replacing pre-filters, lubricating bearings and checking fan belt tension. AR 5828. Each duty was assigned a "quantity" and "annual qty" value. *See* AR 403-406. The quantity number refers to the number of units which require service while the annual quantity refers to the number of service repetitions to be performed annually. Returning to the Air Handling Unit Annual example, both numbers are 260, indicating that there are 260 air handling units which are each to be serviced once per year. Not all quantity and annual quantity numbers are equal, however. An example of this is the "Condensing Unit Semi-Annual [Preventative Maintenance]" duty, which has a quantity of 77 and an annual quantity of 154. In other words, all 77 units are to be serviced twice per year. The specific repetition numbers stated in the RFP are the foundation of CHI's protest.

The RFP required that all offerors submit their base prices on a worksheet. The first several pages of the worksheet require annual price breakdowns per task ("Base Work Pricing Breakdown"). *See* AR 5698-5701. The Base Work Pricing Breakdown expressly included the same quantity and annual quantity numbers as the SOW. In other words, the Air Handling Unit Annual Preventative Maintenance duty required offerors to submit their prices for the specified annual quantity (e.g., 260) for each contract year, one through six. Then, the worksheet also required offerors to submit the total annual price for each functional area. *See* AR 5702-5704.

In addition to the work pricing, the RFP required offerors to complete a "Labor Category Pricing" form. This form was used to specify the fully-burdened rate per hour for various trades required to perform the work required by the RFP. AR 5706. These rates are ceiling labor rates for any IDIQ work. AR 258. For example, Wolf Creek's Labor Category Pricing form includes hourly rates for HVAC Mechanics, Carpenters, and Painters. AR 9468.

The RFP stated the following factors would be used to evaluate offers: (1) Mission Suitability, (2) Price, and (3) Relevant Experience and Past Performance. The Price factor was the most important; the other two, which were weighted "approximately equal to" each other, were together "approximately equal to Price." AR 8494. This, naturally, means that the Price factor comprised approximately 50% of NASA's consideration while the other two comprised approximately 25% each. Wolf Creek and CHI received equal Past Performance ratings. Out of a total of 1,000 possible points for Mission Suitability, CHI received a score of 577 while Wolf Creek received a score of 750. Neither the Past Performance nor the Mission Suitability ratings are challenged in this protest. Instead, CHI challenges NASA's determinations regarding the price factor. As for price, the parties' total bids were approximately equal, with Wolf Creek bidding $55,257,898 and CHI bidding $55,181,849. Both of these numbers are slightly higher than the IGCE estimate of $52,386,377.

### B. GAO Protest

After considering all of the proposals, NASA determined that Wolf Creek's proposal represented the best value to the Government. Disgruntled, CHI filed a protest at the GAO. Initially, CHI challenged only NASA's Mission Suitability rating. However, after receiving the agency's record, CHI filed a supplemental challenge wherein it argued that Wolf Creek's proposal violated the pricing rules of the RFP. Because the majority of the GAO's decision was based on the Mission Suitability protest, nothing further needs to be said of the GAO protest save that here, CHI only challenges Wolf Creek's pricing and NASA's understanding of Wolf Creek's pricing information. It does not challenge the Mission Suitability rating.

### II.  Legal Standards

The Administrative Procedure Act ("APA") sets the proper standard of review in bid protest actions. *See Banknote Corp. v. Am., Inc. v. United States*, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004). Under the APA, this Court reviews the record in post-award bid protests to determine whether the agency's award decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A). "[A] bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or, (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Demonico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

The question before a court faced with a motion for judgment upon the administrative record is whether, based upon both the disputed and undisputed facts in the administrative record ("AR"), the plaintiff has met its burden of proof that the agency failed to follow proper procedures or comply with the Federal Acquisition Regulations ("FAR"). *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). Such a ruling is based upon the evidence contained within the AR as produced by the agency. In essence, this analysis amounts to an expedited trial upon a paper record, and the court is required to make factual findings based upon the AR. *Bannum*, 404 F.3d at 1356. That said, "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983); *Ala. Aircraft Indus., Inc. – Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009).

## III.    Discussion

This case is rather straightforward. The parties agree that the two issues to be resolved by this Court are: (1) whether Wolf Creek's pricing proposal complied with the requirements of the RFP; and (2) whether NASA's evaluation of Wolf Creek's proposal was consistent with the terms of the RFP. The Court concludes that Wolf Creek's proposal complied with the requirements of the RFP and that NASA's evaluation was adequate to satisfy the terms of the RFP which are challenged by CHI.

### A.  Wolf Creek's Offer Complied With the Terms of the RFP

As described above, the RFP included fifteen functional areas, each of which was divided into specific categories. These categories were in turn split into several specifically-enumerated tasks. Each of these tasks was assigned a number of repetitions it must be performed annually. Recalling the Court's discussion above, for example, the Air Handling Unit Annual task required 260 repetitions per year. The thrust of CHI's challenge to Wolf Creek's offer is that Wolf Creek "effectively reduced the number of maintenance events [repetitions] established in the RFP, and was awarded the FORM II contract on that improper basis." CHI Mot. at 26. In essence, CHI claims that Wolf Creek assumed away a number of repetitions—instead of 260 per year, it priced 250, 245, or whatever the case may be. The point, according to CHI, is that Wolf Creek could not have included in its price the performance of all tasks because its price declined over the course of the contract.

The Court does not find support for this position in the record. The parties are in agreement that the RFP required offerors to agree to perform the number of maintenance repetitions stated in the RFP on the worksheet discussed above. *See* AR 5698. Wolf Creek did so. CHI challenges this conclusion solely based upon Wolf Creek's decreasing prices and a report produced for the GAO *after* NASA had reached its award decision. Neither basis is sufficient to sustain CHI's challenge: the former because, on the face of Wolf Creek's proposal, it has expressly agreed to perform all the repetitions called for in the RFP; the latter, because the report was not before the agency, thus could not be

4

considered by it, and therefore cannot render NASA's decision arbitrary, capricious, or otherwise contrary to law.

The parties make quite a commotion about the GAO's decision in *Tri-State Gov't Servs., Inc.*, B-277315.2, 97-2 CPD ¶ 143. In that case, the offeror actually crossed out the number of services (here, repetitions) to be provided and replaced the RFP's numbers with its own. Wolf Creek did not affirmatively modify any numbers; instead, it expressly agreed to them. The act of affirmative modification in *Tri-State* is so unlike the present case that the Court finds itself compelled to agree with Wolf Creek and conclude that it is inapposite here.

All told, the Court cannot explain Wolf Creek's decreasing prices, largely because evidence of Wolf Creek's internal discussions is not before the Court. Just as the Court lacks access to this information, so too does CHI. The point cannot be denied, however, that on the face of its proposal, Wolf Creek has complied with the requirement that it price *all repetitions* called for under the RFP. Thus, the Court cannot sustain CHI's protest on the grounds that Wolf Creek's proposal violated the rules set forth in the RFP because CHI's claim that Wolf Creek does not intend to perform all repetitions is wholly speculative.

### B. NASA's Evaluation of Wolf Creek's Proposal Satisfied the Challenged Terms of the RFP

CHI also challenges NASA's evaluation of Wolf Creek's proposal. This challenge is premised upon the "incongruity" between Wolf Creek's rising labor rates and decreasing price estimates. According to CHI, had NASA engaged in the sort of analysis it proffered in the RFP, it would have recognized this "incongruity" which would have raised serious questions as to the propriety of Wolf Creek's proposal.

Before turning to the parties' arguments, it is important to emphasize what is and what is not before the Court in this protest. The RFP stated several analyses which would be performed on each offer, but several of these have been disavowed by CHI as the basis of its protest. *See, e.g.*, CHI Rep. at 3 ("CHI has never and does not now challenge Wolf Creek's price as impermissibly low."); *id.* ("CHI's protest is not an attack on NASA's price realism analysis"); *see also* CHI Rep. at 23 n. 18 (stating that if Wolf Creek had allocated certain costs in the manner proposed by the Government, "it *would have* run afoul of the RFP's commitment that the Agency would analyze price proposals for unbalanced pricing.").[2] CHI's disavowals leave only the following analyses expressly stated in the RFP:

(1) Comparison of proposed prices received in response to the solicitation.

---

[2] Notably, NASA *did* conduct an unbalanced pricing analysis to determine whether any categories or sub-categories were priced unreasonably low, and it also considered whether relatively low pricing led to an unreasonable risk of default. AR 9542.

(2) Comparison of proposed prices with independent Government cost estimates.

(3) Analysis of pricing information provided by the Offeror.

AR 270.[3]  Information subject to NASA's analysis included not only the specific prices proposed, but any "supporting information to explain the basis of estimate for the proposed amounts" stated in the worksheet.  AR 8475.  Notably, the RFP invited, but did not require, a detailed statement of the basis for an offeror's pricing.[4]

CHI argues that NASA failed to conduct a meaningful review because it does not highlight the "incongruity" in Wolf Creek's pricing.  More to the point, it appears that CHI believes that Wolf Creek's decreasing prices should have set off alarms when compared to both CHI's proposal and the IGCE, each of which displayed increasing prices.  CHI seems to believe that NASA's analysis was cursory, only looking at overall price and annual costs.

Both the Government and Wolf Creek counter CHI's claims.  Wolf Creek's challenge is particularly telling.  Wolf Creek notes that NASA compared each offeror's proposed prices for each SOW element to the IGCE.  AR 9525 (CHI), 9527 (Wolf Creek).  The analysis notes that both CHI and Wolf Creek had some prices higher than the IGCE and some prices lower.  NASA also compared each offer's prices against each other.  AR 9528, 9532-39.  This comparison included reviews of total price, annual price, IDIQ prices and labor category pricing.  AR 9532-40.

In this Court's view, under the restrictive standard of review upon which it must base its decision, NASA's review complied with the terms of the RFP.  It compared the offerors' prices against each other and against the IGCE, and there are enough references in the AR to both CHI's and Wolf Creek's limited pricing information to lead the Court to conclude that this information, too, was considered.  All told, it appears that this protest is nothing more than CHI's effort to voice its disagreement with NASA's source selection decision, which is simply not enough for this Court to sustain CHI's protest. *See Sci. Applications Int'l Corp. v. United States*, 108 Fed.Cl. 235, 248 (2012) ("Mere disagreement with agency evaluations 'fall[s] far short of meeting the heavy burden of demonstrating that the findings in question were the product of an irrational process and hence were arbitrary and capricious.'") (quoting *Banknote*, 56 Fed.Cl. 377, 384 (2003)).  Because this Court "is not to substitute its judgment for that of the agency," *Motor Vehicle*, 463 U.S. at 43, the Court concludes that NASA's evaluation was in conformity with the law.

---

[3] These three considerations are stated in FAR Subpart 15.404-1(b)(2)(i), (v) and (vii).
[4] *See* AR 8476 ("Offerors are encouraged to link formulas and amounts in the pricing model spreadsheets to the maximum extent possible to ensure traceability between detail and summary level data. *Offerors may, based solely on their discretion, attach detailed information, presenting in the Offeror's own format, which supports the amounts on the templates.*  All pricing and estimating techniques, computations, and basis of estimates should be clearly explained in a narrative format.") (emphasis added).

**IV.    Conclusion**

In sum, the Court finds that the AR is lacking in evidence to demonstrate that Wolf Creek violated any rules stated in the RFP.  The Court also concludes that there is sufficient evidence in the AR to establish that NASA adequately performed the evaluations required by the RFP.  For these reasons, CHI's motion for judgment on the AR is DENIED and the cross-motions of the Government and Wolf Creek are GRANTED.  The Clerk is directed to enter judgment accordingly and to mark this case closed.

s/ Edward J. Damich
EDWARD J. DAMICH
Senior Judge