**Hanson P. AGWIAK, et al., Plaintiffs,**

v.

**The UNITED STATES of America, Defendant.**

No. 98–786 C.

United States Court of Federal Claims.

Feb. 18, 2005.

David H. Shoup, Tindall Bennett & Shoup, P.C., Anchorage, Alaska, for plaintiffs.

J. Reid Prouty, Trial Attorney, Commercial Litigation Branch, Civil Division, Kathryn A. Bleecker, Assistant Director, David M. Cohen, Director, Peter D. Keisler, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant.

### OPINION AND ORDER

GEORGE W. MILLER, Judge.

This matter is before the Court on the parties' cross-motions for summary judgment on liability. Plaintiffs, Henry P. Agwiak, William Bradford, Bruce Christian, Clyde Christman, Patrick Easter, Jay Escott, Carl Fanning, Michael Foster, Richard Hendricks, Darrell Hobson, Steve Hobson, Maurice Ivanoff, Steve Munn, John Nelson, Jim Norris, James Russell, Alf Skaflestad, Darryl Stevens, Gary Wall, and John Williams, filed a Motion for Partial Summary Judgment Regarding Liability on August 12, 2004. On September 21, 2004, defendant, the United States (the "Government"), filed a Cross–Motion for Summary Judgment and Opposition to Plaintiff's Motion for Partial Summary Judgment Regarding Liability. In response, plaintiffs filed an Opposition to Cross–Motion for Summary Judgment and Reply to Opposition to Plaintiffs' Motion for Partial Summary Judgment Regarding Liability on October 21, 2004; the Government thereafter filed a Reply to Plaintiffs' Opposition to Cross–Motion for Summary Judgment on November 8, 2004. For the following

reasons, plaintiffs' motion is GRANTED in part and DENIED in part, and defendant's motion is GRANTED in part and DENIED in part.

## BACKGROUND

### I. Facts

All plaintiffs are former employees of the Office of Environmental Health and Engineering, Alaska Area Native Health Service, United States Public Health Service, Department of Health and Human Services ("Agency"). *Agwiak v. United States*, 347 F.3d 1375, 1376 (Fed.Cir.2003). Plaintiffs' jobs involved the construction of water, sewer, and solid waste facilities in Alaska, usually in rural Native Alaskan villages.[1] *Id.; Agwiak v. United States*, No. 98–789C, slip op. at 1 (Fed.Cl. Aug. 30, 2002). As a result of project funding variations, plaintiffs' positions were converted to seasonal appointments beginning in 1993. *Agwiak*, 347 F.3d at 1376. Generally, Agency employees' "terms" under these appointments lasted for a period of four years. *Agwiak*, slip op. at 2. Even if hired for a four-year term, employees were informed that they could be laid off at any time due to an unpredictable workload. *Id.* The minimum time employees were expected to work per year was six months with the maximum set at ten months. *Id.* If an employee wished to continue working for the Agency at the end of his term, he was required to apply for another term appointment. *Id.*

Throughout each term, plaintiffs typically worked several assignments, which lasted from several weeks to over a year, based in different "duty stations" throughout Alaska. *Agwiak*, 347 F.3d at 1377. Plaintiffs were provided with airfare when they were transferred from one duty station to another. *Agwiak*, slip op. at 2. The Agency also paid to ship up to 500 pounds of plaintiffs' personal effects upon relocation. *Id.* Each time a plaintiff was assigned to a new duty station, the Agency changed the plaintiff's official duty station for the duration of his term to reflect his new location. *Agwiak*, 347 F.3d at 1377.

The Agency's job hiring announcement for plaintiffs' positions provided that "[e]xtensive travel to communities throughout Alaska is required, often in small unpressurized aircraft. Normally, long periods of residence in small bush communities will be required." Agency's Hiring Announcement, attached to Pls.' Opp'n to Cross–Mot. for Summ. J. While the Agency did not promise to secure accommodations for the plaintiffs at their assigned duty stations, it provided them with rudimentary housing at its own expense. *Agwiak*, 347 F.3d at 1376–77. Plaintiffs and defendant disagree on the nature of these accommodations, which apparently ranged from pump-house floors to rental houses. Pls.' Findings ¶ 7; Def's Resp. ¶ 7.

Most of the duty stations to which plaintiffs were assigned were based in small rural Native Alaskan villages. With the exception of the two duty stations located in Anchorage (Anchorage and Elmendorf Air Force Base), the largest town in which a duty station was located was Bethel, which has a population of over 5,000.[2] Def.'s Proposed Finding of Un-

---

1. A complete list of plaintiffs' duty stations is as follows: Akiachak, Akiak, Alakanuk, Aleknagik, Allakaket, Anchorage, Angoon, Anvik, Arctic Village, Atmautluak, Beaver, Bethel, Brevig Mission, Buckland, Chalkyitsik, Chevak, Chuathbaluk, Crooked Creek, Deering, Dillingham, Diomede, Egegik, Ekwok, Elim, Elmendorf Air Force Base (in Anchorage), False Pass, Golovin, Goodnews Bay, Grayling, Hoonah, Hooper Bay, Hughes, Hydaburg, Igiugig, Kake, Kaltag, Kasaan, Kipnuk, Kivalina, Klawock, Kobuk, Kokhanok, Koliganek, Kotlik, Kotzebue, Koyuk, Koyukuk, Kwethluk, Larsen Bay, Manokotak, Mekoryuk, Minto, Mountain Village, Newhalen, New Koliganek, New Stuyahok, Nome, Noorvik, Northway, Nulato, Ouzinkie, Perryville, Pilot Point, Rampart, Russian Mission, Savoonga, Saxman, Scammon Bay, Se-

lawik, Shaktoolik, Sheldon Point, Shishmaref, Sleetmute, South Naknek, Stebbins, Stevens Village, Stony River, St. Paul, Takotna, Tatitlek, Teller, Tetlin, Togiak, Toksook Bay, Ugashik, Unalakleet, Wales, White Mountain, and Yakutat. Pls.' Proposed Findings of Uncontroverted Fact ("Pls.' Findings") ¶ 3; Def.'s Resp. to Pls.' Proposed Findings of Undisputed Facts ("Def.'s Resp.") ¶ 3. The names of these locations are spelled according to the 2000 U.S. Census Bureau data, attached to the Decl. of John J. Lehe, attached to Pls.' Opp'n to Cross–Mot. for Summ. J.

2. Village populations are based on the 2000 U.S. Census Bureau data, attached to the Decl. of John J. Lehe, attached to Pls.' Opp'n to Cross–Mot. for Summ. J.

controverted Facts ("Def.'s Findings") ¶ 3; Pls.' Opp'n to Proposed Findings of Uncontroverted Fact Filed by Def. ("Pls.' Resp.") ¶ 3. The next three largest duty stations, Dillingham, Kotzebue, and Nome, are home to populations greater than 1,000. Def.'s Findings ¶ 3; Pls.' Resp. ¶ 3. The populations of the remaining duty stations are under 1,000, ranging from 11 in Ugashik to 860 in Hoonah, with the average appearing to be about two hundred. 2000 U.S. Census Bureau data, attached to the Decl. of John J. Lehe, attached to Pls.' Opp'n to Cross–Mot. for Summ. J.

With the exception of Anchorage, Elmendorf Air Force Base, Tetlin, and Northway, all of the duty stations were accessible only by boat or plane. Pls.' Findings ¶ 4; Def.'s Resp. ¶ 4. Regularly scheduled air service was not available to several of the duty stations, in which case chartered planes were necessary for travel to and from the site. Pls.' Findings ¶ 8; Def.'s Resp. ¶ 8. For those duty stations that did have regularly scheduled air service, fares were generally upwards of $100 for one-way travel. Pls.' Findings ¶ 8; Def.'s Resp. ¶ 8. Due to these constraints, plaintiffs did not commute between their duty stations and other communities that did not encompass their duty stations during the duration of their assignment.

In early 1998, a tribal organization, the Alaska Native Tribal Health Consortium ("ANTHC"), opted to take over operation of the Alaska Area Native Health Service. *Agwiak*, 347 F.3d at 1377. The Agency's construction projects were turned over to the ANTHC, and plaintiffs still employed by the Agency were subjected to reduction-in-force actions. *Id.* Plaintiffs who desired continued employment were hired directly by the ANTHC and continued working on construction projects as they had when employed by the Agency. *Agwiak*, slip op. at 3.

## II. Proceedings

On October 13, 1998, plaintiffs brought suit in the Court of Federal Claims ("COFC") for, *inter alia*, per diem pay under 5 U.S.C. § 5702. *Agwiak*, 347 F.3d at 1377. Plaintiffs were subsequently granted leave to amend their complaint to include an alternative claim for remote worksite pay pursuant to 5 U.S.C. § 5942(a). *Id.* The amended complaint was filed with the COFC on March 7, 2000. *Id.* On April 27, 2000, plaintiffs moved for partial summary judgment regarding their per diem and remote worksite pay claims. *Id.* The Government opposed the plaintiffs' motion and filed a cross-motion for summary judgment on June 30, 2000. *Id.* On August 30, 2002, the COFC granted summary judgment for the Government on the per diem and remote worksite pay claims. *Agwiak*, No. 98–789C.

The plaintiffs appealed the COFC's grant of the Government's motion for summary judgment. On October 30, 2003, the United States Court of Appeals for the Federal Circuit ("Federal Circuit") affirmed the COFC's judgment regarding the plaintiffs' claim for per diem pay and vacated the COFC's judgment regarding the plaintiffs' claim for remote worksite pay. *Agwiak*, 347 F.3d 1375. It then remanded the case to the COFC for a determination of whether the duty stations were, or should have been, designated as remote pursuant to 5 C.F.R. § 591.304(a) such that the plaintiffs are entitled to receive remote worksite pay. *Id.*

## III. Relevant Statute and Regulations

### A. *Statute*

Plaintiffs' claims are governed by 5 U.S.C. § 5942, which sets forth the requirements for Government employees to be entitled to an allowance based on duty at remote worksites. The pertinent parts of the statute are as follows:

[A]n employee ... who is assigned to duty ... at a site so remote from the nearest established communities or suitable places of residence as to require an appreciable degree of expense, hardship, and inconvenience, beyond that normally encountered in metropolitan commuting, on the part of the employee in commuting to and from his residence and such worksite, is entitled, in addition to pay otherwise due him, to an allowance of not to exceed $10 a day. The allowance shall be paid under regulations ... defining and designating those sites,

areas, and groups of positions to which the rates apply.

5 U.S.C. § 5942(a) (2000).

B. *Regulations*

The Court looks to the regulations designed to implement the statute for further guidance on how to determine when employees are entitled to remote worksite pay. In order to be awarded remote worksite pay, a plaintiff must show both that his duty station was remote according to 5 C.F.R. § 591.304 and that he is eligible for an allowance pursuant to 5 C.F.R. § 591.306.

1. *5 C.F.R. § 591.304*

The Court makes a determination of remoteness based on the criteria listed in 5 C.F.R. § 591.304. Under this regulation, there are three different ways that a plaintiff may establish a duty station as remote. Each of these provisions is connected with the disjunctive "or," so a plaintiff need only prove one of them to recover remote worksite pay. The provisions do, however, overlap significantly, and it will often be the case that the same worksite will be deemed remote under more than one of them.

a. *The Duty Post is Farther than Fifty Miles from the Nearest Established Community of Suitable Place of Residence*

A worksite is remote under 5 C.F.R. § 591.304(a)(1) if "[n]ormal ground transportation (e.g., automobile, train, bus) is available on a daily basis and the duty post is 80 kilometers (50 miles), or more, one way from the nearest established community or suitable place of residence." 5 C.F.R. § 591.304(a)(1) (2004). The regulation further provides that

the criteria in paragraph (a)(1) of this section are not met:

(1) When the duty post is within the boundary of a metropolitan area, a developed urban area, or community of sufficient size to provide adequate facilities; and

(2) When the duty post is within 80 kilometers (50 miles) of the center of ... a metropolitan area, a developed urban area,

or community of sufficient size to provide adequate consumer facilities. (This generally excludes a post of duty within 80 kilometers (50 miles) of any city of 5,000 or more population.)

*Id.* § 591.304(b).

Taken together, the language of 5 C.F.R. § 591.304(a)(1) and (b) indicates that the drafters of the regulation understood an established community or suitable place of residence, as those terms are used in 5 C.F.R. § 591.304(a)(1), to mean a town with an approximate population of 5,000 or more. Therefore, in order to be deemed remote under 5 C.F.R. § 591.304(a)(1), a duty station to which normal ground transportation is available must be farther than 50 miles from a community of approximately 5,000 people.

b. *Daily Commuting to the Duty Post is Impractical and Employees are Required to Remain at the Duty Post during the Workweek*

A worksite is remote under 5 C.F.R. § 591.304(a)(2) if "[d]aily commuting is impractical because the location of the duty post and available transportation are such that agency management requires employees to remain at the duty post for their workweek as a normal and continuing part of the conditions of employment." *Id.* § 591.304(a)(2).

While the regulation does not specifically apply 5 C.F.R. § 591.304(b) to this provision, separation from an established community or suitable place of residence is an implicit condition because the "commuting" and "transportation" referred to therein must be from some place to the duty station. Further support for this proposition is derived from the governing statute itself, which authorizes remote worksite pay for worksites "remote from the nearest established communities or suitable places of residence." 5 U.S.C. § 5942. The statute does not authorize such pay for worksites located within established communities or suitable places of residence. The Court understands this provision, therefore, as designating a site as remote if daily commuting is impractical, employees are required to remain at the worksite during the

week, *and* the worksite itself is not located within 50 miles of an established community or suitable place of residence.

### c. *The Duty Post can Only be Reached by Boat, Aircraft, or Other Unusual Conveyance*

A worksite is remote under 5 C.F.R. § 591.304(a)(3) if "[t]ransportation may be accomplished only by boat, aircraft, or unusual conveyance, or under extraordinary conditions, and the distance, time, and commuting conditions result in expense, inconvenience, or hardship significantly greater than that encountered in metropolitan area commuting." 5 C.F.R. § 591.304(a)(3).

Again, the regulation does not specifically apply 5 C.F.R. § 591.304(b) to this provision. However, separation from an established community or suitable place of residence is an implicit condition for the same reason discussed above; the "commuting" and "transportation" referred to therein must be from some place to the duty station. Under this provision, therefore, remoteness is established when transportation to the duty station can only be accomplished through extraordinary means, *and* the worksite itself is not located within 50 miles of an established community or suitable place of residence.

### 2. *5 C.F.R. § 591.306*

Remote worksite pay does not follow automatically from the establishing of a duty station as remote pursuant to at least one of the provisions in 5 C.F.R. § 591.304. A plaintiff must also show that he is eligible for such an allowance by meeting the requirements provided in 5 C.F.R. § 591.306. One of the significant limiting restrictions under this regulation is that the plaintiff must not reside at the duty station for his own convenience, but rather at the direction of his employer. 5 C.F.R. § 591.306 provides, in pertinent part, as follows:

(a) An authorized allowance rate shall be paid to each employee with a permanent

duty station at or within a remote post of duty approved under § 591.304, regardless of type of appointment or work schedule, only ... [if] the employee remains at the worksite at the direction of management because daily commuting is impractical.

(c) An employee who resides permanently, or temporarily for his or her own convenience at a remote duty post is not eligible for an authorized allowance rate during his or her period of residence.

*Id.* § 591.306.

### DISCUSSION

### I. Issues

The parties agree that the Agency did not, in fact, classify plaintiffs' duty stations as remote work locations. On remand, therefore, the first issue is whether plaintiffs' duty stations should have been designated as remote work locations,[3] *i.e.*, even though the Agency did not determine that plaintiffs' duty stations were remote, whether it should have done so under at least one of the provisions detailed in 5 C.F.R. § 591.304(a). If the Court finds that the Agency should have designated plaintiffs' duty stations as remote, the second issue is whether plaintiffs resided at the duty stations for their own convenience, in which case they would be ineligible for remote duty pay pursuant to 5 C.F.R. § 591.306(c).

### II. Standard of Review of Motions for Summary Judgment

Under Rule 56(a) of the Rules of the United States Court of Federal Claims ("RCFC"), summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A material fact is one that might affect the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute over a material fact is

---

**3.** Plaintiffs do not contend that the Anchorage and Elmendorf Air Force Base duty stations should have been deemed remote, Pls.' Opp'n to Cross–Mot. for Summ. J. at 2, so the Court will not address the status of those duty stations in its discussion. When the Court refers to plaintiffs' duty stations in the remainder of its opinion, it will be referring to all of plaintiffs' duty stations except for Anchorage and Elmendorf Air Force Base.

genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, "'the court views the evidence and any disputed factual issues in the light most favorable to the party opposing the motion.'" *Process Control Techs. v. United States,* 53 Fed.Cl. 71, 76 (2002) (quoting *Enzo Biochem, Inc. v. Gen–Probe Inc.,* 285 F.3d 1013, 1017 (Fed.Cir. 2002)). The movant for summary judgment bears the burden of demonstrating that "there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548.

The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts. *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987) (citing *Houghton v. Foremost Fin. Servs. Corp.,* 724 F.2d 112, 114 (10th Cir.1983)). Rather, the court must "evaluate[ ] each motion on its own merits, applying the same standard for summary judgment to each motion." *Gen. Elec. Co. v. United States,* 60 Fed.Cl. 782, 789 (2004).

## III. Analysis

Plaintiffs are entitled to remote worksite pay for their work at all of the duty stations except for Bethel. As a threshold matter, the Court notes that the Federal Circuit held, and the Government now concedes, that the mere fact that plaintiffs did not commute to and from their duty stations does not preclude them from being eligible for a remote worksite allowance. *Agwiak,* 347 F.3d 1375.

### A. *Plaintiffs Are Not Prohibited from Obtaining Remote Worksite Pay Simply Because They Did Not Commute*

█ Remote worksite pay is authorized by 5 U.S.C. § 5942, which, as set forth above, provides in pertinent part that

> an employee ... who is assigned to duty ... at a site so remote from the nearest established communities or suitable places

of residence as to require an appreciable degree of expense, hardship, and inconvenience, beyond that normally encountered in metropolitan commuting, on the part of the employee in commuting to and from his residence and such worksite, is entitled, in addition to pay otherwise due him, to an allowance of not to exceed $10 a day. The allowance shall be paid under regulations ... defining and designating those sites, areas, and groups of positions to which the rates apply.

5 U.S.C. § 5942(a).

The COFC originally held that because "commuting, as such, did not occur" in this case, there is "no basis for liability pursuant to 5 U.S.C. § 5942." *Agwiak,* slip op. at 4. On appeal, the Federal Circuit held that an employee need not be engaged in commuting to be entitled to remote pay. "Rather, the statute is directed to a situation where commuting is impractical or particularly onerous." *Agwiak,* 347 F.3d at 1379. Therefore, the mere fact that plaintiffs did not commute to and from their worksites does not end the inquiry into whether they are entitled to remote worksite pay.

### B. *Plaintiffs' Duty Stations Should Have Been Designated as Remote Work Locations Pursuant to 5 C.F.R. § 591.304*

█ A finding of remoteness is authorized by 5 C.F.R. § 591.304 under three distinct circumstances. As the regulation links these circumstances with the disjunctive "or," only one of the three must be fulfilled in order to find a worksite remote. Plaintiffs have shown that all of the duty stations, with the exception of Bethel, meet the requirements of at least one, and oftentimes two, of these three provisions.

#### 1. *Tetlin and Northway Should Have Been Designated as Remote Work Locations Pursuant to 5 C.F.R. § 591.304(a)(1)*

The first circumstance that authorizes a finding of remoteness is detailed in 5 C.F.R. § 591.304(a)(1), which provides that a worksite is remote when "[n]ormal ground trans-

portation (e.g., automobile, train, bus) is available on a daily basis and the duty post is 80 kilometers (50 miles), or more, one way from the nearest established community or suitable place of residence." 5 C.F.R. § 591.304(a)(1).

While neither the statute nor the regulation defines "established community" or "suitable place of residence," 5 C.F.R. § 591.304(b) provides guidance on how to interpret these terms by excluding certain duty stations that meet the terms of 5 C.F.R. § 591.304(a)(1) from being remote. A duty station "within the boundary of a metropolitan area, a developed urban area, or community of sufficient size to provide adequate facilities" is not considered remote under subsection 5 C.F.R. § 591.304(a)(1). *Id.* § 591.304(b)(1). Additionally, a duty station located within 50 miles from "a metropolitan area, a developed urban area, or community of sufficient size to provide adequate consumer facilities" is not considered remote under 5 C.F.R. § 591.304(a)(1). *Id.* § 591.304(b)(2).

The regulation goes on to suggest that the requirements of 5 C.F.R. § 591.304(b) "generally exclude[ ] a post of duty within 80 kilometers (50 miles) of any city of 5,000 or more population." *Id.* Taken together, the language of 5 C.F.R. § 591.304(a)(1) and (b) indicates that the drafters of the regulation understood an established community or a suitable place of residence to mean a town with a population of 5,000 or more. Of course, 5 C.F.R. § 591.304(b) merely excludes certain circumstances from being remote rather than affirmatively defining an established community or suitable place of residence. Therefore, a population of 5,000 should be understood as a flexible remoteness threshold rather than an absolute requirement. Under certain circumstances, it is possible that a town with a population of 4,000 could be deemed an established community so long as it provided "adequate consumer facilities," thereby precluding a determination of remoteness. Contrary to the Government's argument, however, a town is not presumed to be a suitable place of residence for the purpose of remote worksite pay merely because it is inhabited. Such a definition could easily have been set forth in the regulations. The fact that it was not, along with the fact that 5 C.F.R. § 591.304(b) expressly indicates that a suitable place of residence will have a population of at least 5,000, leads the Court to reject the Government's argument.

The Court is certainly not diminishing the value and importance of towns with populations under 5,000 when reading the statute and regulations in this way. It is not passing judgment on the Native Alaskan villages at issue in this case and in no way means to imply that they are not established communities or suitable places of residence for purposes other than remote worksite pay claims. The Court is simply interpreting 5 U.S.C. § 5942 in light of its implementing regulations to determine the meaning of the statutory language.

### a. *Normal Ground Transportation Available*

Unlike the rest of the duty station villages at issue, plaintiffs and the Government agree that normal ground transportation (*e.g.*, automobile, bus, etc.) is available to the towns of Tetlin and Northway. The rest of the duty stations are not covered by this provision because they are not accessible by normal ground transportation.

### b. *Not Established Communities*

The Government argues that Tetlin and Northway, as well as the rest of plaintiffs' duty station locations, are established communities or suitable places of residence. The Court disagrees, finding that Tetlin and Northway are not established communities or suitable places of residence for the purposes of remote worksite pay. The total population of Northway is 107, and the total population of Tetlin is 117. Even when taking the suggested population of 5,000 as a flexible guideline rather than a strict limiting factor, the populations of Tetlin and Northway are nowhere near 5,000. Consequently, they are not established communities as that phrase is used in 5 U.S.C. § 5942 and 5 C.F.R. § 591.304(a)(1).

### c. Not Within 50 Miles of an Established Community

The closest community of any size to Tetlin and Northway is Tok, with a population of 1,393. Pls.' Proposed Supplemental Findings of Uncontroverted Fact ("Pls.' Supplemental Findings") ¶ 2; Def.'s Resp. To Pls.' Proposed Finding of Undisputed Facts ("Def.'s Supplemental Resp.") ¶ 2. Tok's population is simply too far from 5,000 to make it an established community. Both plaintiffs and the Government agree that Northway and Tetlin are hundreds of miles from any community of 5,000 or more. Pls.' Supplemental Findings ¶ 3; Def.'s Supplemental Resp. ¶ 3. It is clear, therefore, that while normal ground transportation is available to Tetlin and Northway, these villages are farther than 50 miles from the nearest established community or suitable place of residence. Tetlin and Northway are remote worksites according to the requirements set out in 5 C.F.R. § 591.304(a)(1).

### 2. All of the Duty Stations, with the Exception of Bethel,[4] Should Have Been Designated as Remote Work Locations Pursuant to 5 C.F.R. § 591.304(a)(2)

An additional circumstance under which a finding of remoteness is authorized occurs pursuant to 5 C.F.R. § 591.304(a)(2) when "[d]aily commuting is impractical because the location of the duty post and available transportation are such that agency management requires employees to remain at the duty post for their workweek." 5 C.F.R. § 591.304(a)(2). While only the first portion of the regulation defining remote locations actually refers to an established community or suitable place of residence as further clarified in section (b), separation from such a

community is an implicit condition for the application of 5 C.F.R. § 591.304(a)(2) and (a)(3) because the "commuting" and "transportation" referred to therein must be from some place to the duty station. This understanding is supported by the language of the statute, which authorizes additional pay for assignment to a site "remote from the nearest established communities or suitable places of residence." 5 U.S.C. § 5942. The statute does not require remote worksite pay for assignment to an established community or suitable place of residence that is not within commuting distance to other established communities or suitable places of residence.

### a. Not Established Communities

The Government argues that the Native Alaskan villages in which plaintiffs were stationed were themselves "established communities" and "suitable places of residence," so a threshold factor necessary for a finding of remoteness under 5 C.F.R. § 591.304(a)(2) is not met. The Court rejects this argument for all of the duty stations at issue except Bethel based on the Court's earlier analysis of the drafters' understanding of an "established community."[5] While the population of 5,000 suggested in 5 C.F.R. § 591.304(b) provides a flexible guideline in determining what a suitable place of residence is, all of the duty stations at issue, with the exception of Bethel, do not even come close to reaching it. After Bethel, the largest villages in which duty stations were located are Nome, Kotzebue, and Dillingham, with populations of 3,505, 3,082, and 2,466 respectively. Based on the target population of 5,000 provided in 5 C.F.R. § 591.304(b), the Court finds that none of plaintiffs' duty stations, except Be-

---

**4.** This includes the duty stations located in Akiachak, Akiak, Alakanuk, Aleknagik, Allakaket, Angoon, Anvik, Arctic Village, Atmautluak, Beaver, Brevig Mission, Buckland, Chalkyitsik, Chevak, Chuathbaluk, Crooked Creek, Deering, Dillingham, Diomede, Egegik, Ekwok, Elim, False Pass, Golovin, Goodnews Bay, Grayling, Hoonah, Hooper Bay, Hughes, Hydaburg, Igiugig, Kake, Kaltag, Kasaan, Kipnuk, Kivalina, Klawock, Kobuk, Kokhanok, Koliganek, Kotlik, Kotzebue, Koyuk, Koyukuk, Kwethluk, Larsen Bay, Manokotak, Mekoryuk, Minto, Mountain Village, Newhalen,

New Koliganek, New Stuyahok, Nome, Noorvik, Northway, Nulato, Ouzinkie, Perryville, Pilot Point, Rampart, Russian Mission, Savoonga, Saxman, Scammon Bay, Selawik, Shaktoolik, Sheldon Point, Shishmaref, Sleetmute, South Naknek, Stebbins, Stevens Village, Stony River, St. Paul, Takotna, Tatitlek, Teller, Tetlin, Togiak, Toksook Bay, Ugashik, Unalakleet, Wales, White Mountain, and Yakutat.

**5.** *Supra* Part III.B.1.

thel, are established communities for the purposes of determining remote worksite pay.

With respect to the Bethel duty station, plaintiffs themselves indicate that "Bethel ... might qualify as non-remote." Pls.' Opp'n to Cross–Mot. for Summ. J. at 6. The Court finds that Bethel is an established community or suitable place of residence based on its population of 5,471 people. Therefore, Bethel cannot qualify as remote under 5 U.S.C. § 5942.

### b. *Impracticality of Daily Commuting*

Furthermore, commuting to any of these duty stations except Bethel was certainly impractical. In fact, it was not even an option, due to the expense and time involved in such travel. In the words of plaintiff Bruce Christian, "[t]here was just no practical way to do it." Decl. of Bruce Christian at 2, attached to Pls.' Mot. for Partial Summ. J.

The Government concedes that all but four of the duty station towns were accessible only by boat or aircraft. It cannot seriously be argued that commuting by boat or aircraft is "practical" enough to place it outside the reach of 5 C.F.R. § 591.304(a)(2). The Government further agrees that two of the remaining four villages in which plaintiffs' duty stations were located, Tetlin and Northway, are both hundreds of miles from any community of 5,000 or more. Hundreds of miles is certainly beyond the distance an employee may practically be expected to commute. Plaintiffs are not asserting that they are entitled to remote worksite pay for work at the other two of the remaining four duty stations, Anchorage and Elmendorf Air Force Base.

### c. *On–Site Living Required*

At the outset of plaintiffs' employment, the Agency informed them that "[e]xtensive travel to communities throughout Alaska is required, often in small unpressurized aircraft. Normally, long periods of residence in small bush communities will be required." Agency's Hiring Announcement, attached to Pls.' Opp'n to Cross–Mot. for Summ. J. This indicates that plaintiffs remained at their duty stations not for their own convenience, but at the direction of the Agency. The Agency's provision of housing for plaintiffs at its own expense lends further support to this conclusion. While the Agency's Hiring Announcement specifically stated that formal housing would not be supplied, it does not appear that plaintiffs were ever in a position where they had to procure it on their own. Again, the natural inference is that the Agency required plaintiffs to remain at their duty stations during the work week.

The Government offers no evidence to rebut plaintiffs' contention that they were required to remain at their duty stations. Furthermore, even if plaintiffs were not required to remain at their duty stations, thus not fulfilling the requirements of remoteness under 5 C.F.R. § 591.304(a)(2), all of the duty stations, with the exception of Bethel, should still have been deemed remote pursuant to either the first or third prongs of 5 C.F.R. § 591.304(a).

### 3. *All of the Duty Stations, with the Exceptions of Bethel, Tetlin, and Northway,[6] Should Have Been Designated as Remote Work Locations Pursuant to 5 C.F.R. § 591.304(a)(3)*

The last circumstance under which a finding of remoteness is authorized is pursuant to 5 C.F.R. § 591.304(a)(3) when "[t]ransportation may be accomplished only by boat,

**6.** This includes the duty stations located in Akiachak, Akiak, Alakanuk, Aleknagik, Allakaket, Angoon, Anvik, Arctic Village, Atmautluak, Beaver, Brevig Mission, Buckland, Chalkyitsik, Chevak, Chuathbaluk, Crooked Creek, Deering, Dillingham, Diomede, Egegik, Ekwok, Elim, False Pass, Golovin, Goodnews Bay, Grayling, Hoonah, Hooper Bay, Hughes, Hydaburg, Igiugig, Kake, Kaltag, Kasaan, Kipnuk, Kivalina, Klawock, Kobuk, Kokhanok, Koliganek, Kotlik, Kotzebue, Koyuk, Koyukuk, Kwethluk, Larsen Bay, Manokotak, Mekoryuk, Minto, Mountain Village, Newhalen, New Koliganek, New Stuyahok, Nome, Noorvik, Nulato, Ouzinkie, Perryville, Pilot Point, Rampart, Russian Mission, Savoonga, Saxman, Scammon Bay, Selawik, Shaktoolik, Sheldon Point, Shishmaref, Sleetmute, South Naknek, Stebbins, Stevens Village, Stony River, St. Paul, Takotna, Tatitlek, Teller, Togiak, Toksook Bay, Ugashik, Unalakleet, Wales, White Mountain, and Yakutat.

aircraft, or unusual conveyance, or under extraordinary conditions, and the distance, time, and commuting conditions result in expense, inconvenience, or hardship significantly greater than that encountered in metropolitan area commuting." 5 C.F.R. § 591.304(a)(3). While this provision does not expressly require that the duty station itself be located outside an established community or suitable place of residence, this requirement is logically implicit in the language of 5 C.F.R. § 591.304(a)(3) because the "commuting" and "transportation" referred to therein must be from some place to the duty station.[7]

### a. *Not Established Communities*

At the risk of redundancy, the Court rejects the Government's contention that the villages in which plaintiffs' duty stations were located were themselves established communities or suitable places of residence. After taking into consideration those circumstances that the drafters of the regulations considered to not be remote, the Court concludes that they intended to exclude those communities with an approximate population of 5,000 or more. With the exception of Bethel, none of the villages meet this threshold. In fact, the town with the greatest population after Bethel is Nome, with 1,500 fewer people than the suggested 5,000.

The Government repeatedly points out that "most" of the villages offered basic living amenities, such as a post office, general store, village health clinic, and school. While these are certainly important consumer facilities, the Court is not persuaded that they rise to the level of "adequate consumer facilities" as contemplated in 5 C.F.R. § 591.304(b), especially in light of the villages' small size when compared to the suggested population of 5,000 for a suitable place of residence. Additionally, as pointed out earlier, the mere fact that town is inhabited does not mean that it is a suitable place of residence such that remote worksite pay is not required under 5 U.S.C. § 5942.[8]

### b. *Transportation Only Accomplished by Boat or Aircraft*

As the Government concedes that transportation to all but four of the worksites could only be accomplished via boat or aircraft, this requirement of 5 C.F.R. § 591.304(a)(3) is fulfilled for all of plaintiffs' duty stations with the exceptions of Northway and Tetlin (both of which the Court finds to be remote under 5 C.F.R. § 591.304(a)(1)) and Anchorage and Elmendorf Air Force Base (neither of which is at issue in this case). The necessity of taking a boat or a plane to work coupled with the lack of commercial flights to several of the villages would have made commuting to plaintiffs' duty stations significantly more difficult and expensive than commuting within a metropolitan area.

### C. *Plaintiffs Did Not Reside at Their Duty Stations for Their Own Convenience, so They Are Entitled to Remote Worksite Pay Pursuant to 5 C.F.R. § 591.306*

Plaintiffs are not entitled to remote worksite pay based solely on the fact that their duty stations were remote according to 5 C.F.R. § 591.304. The additional requirements of 5 C.F.R. § 591.306, which designates employee eligibility for remote worksite pay, must be fulfilled. 5 C.F.R. § 591.306(a)(2) provides that remote worksite pay shall be paid to an employee only when (1) he is subject to the "prescribed minimum inconvenience or hardship factors" while commuting to his duty station from the nearest established community or suitable place of residence, or (2) he "remains at the worksite at the direction of management because daily commuting is impractical." 5 C.F.R. § 591.306(a). As these requirements are connected with the disjunctive "or," only one or the other must be met. The regulation goes on to explicitly state that "[a]n employee who resides ... for his or her own convenience at a remote duty post is not eligible for [remote worksite pay]." *Id.* § 591.306(c).

---

7. See the Court's earlier discussion of this determination for further analysis. *Supra* Part III.B.2.

8. *Supra* Part III.B.1.

It is clear that plaintiffs did not, in fact, commute to their duty stations. After stating that there was no practical way to commute to the worksites, one of the plaintiffs states as follows: "That is why no one [commuted]. During the time when I worked for the agency, no one commuted from any of these duty posts." Decl. of Bruce Christian at 2, attached to Pls.' Mot. for Partial Summ. J. Therefore, the first prong of 5 C.F.R. § 591.306(a)(2) is clearly not fulfilled. Plaintiffs do, however, meet the second prong of 5 C.F.R. § 591.306(a)(2). As detailed in the Court's analysis of the application of 5 C.F.R. § 591.304(a) to plaintiffs' duty stations, daily commuting from an established community or suitable place of residence to the duty stations was impractical such that the Agency required plaintiffs to remain on-site.[9]

Furthermore, it is clear that plaintiffs did not remain at the duty posts for their own convenience. This was not a matter of inconvenience, but of impossibility. Due to the isolation of plaintiffs' duty station villages, the time and expense necessarily involved in commuting from an established community or suitable place of residence, roughly defined as a town of 5,000 or more, would have made such travel on a daily basis virtually impossible. Indeed, at no time does the Government contest this point. Rather, the Government argues that the duty stations were themselves established communities, so no commuting was necessary. For the reasons stated earlier, the Court rejects this argument.[10]

## CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Partial Summary Judgment Regarding Liability is GRANTED in part and DENIED in part, and Defendant's Cross-Motion for Summary Judgment is GRANTED in part and DENIED in part. All of plaintiffs duty stations, with the exception of Bethel and those duty stations not at issue in this case (Elmendorf Air Force Base and Anchorage), should have been considered remote under the terms of 5 C.F.R. § 591.304. Further, plaintiffs have met the require-

ments for remote worksite pay set forth in 5 C.F.R. § 591.306. Plaintiffs are entitled to remote worksite pay for the time they spent at these duty stations pursuant to 5 U.S.C. § 5942. Plaintiffs are not, however, entitled to remote worksite pay for the time they spent in Bethel, as this duty station should not have been deemed remote under the standards established in 5 C.F.R. § 591.304.

Plaintiffs' motion is GRANTED and defendant's cross-motion is DENIED as to the following duty stations: Akiachak, Akiak, Alakanuk, Aleknagik, Allakaket, Angoon, Anvik, Arctic Village, Atmautluak, Beaver, Brevig Mission, Buckland, Chalkyitsik, Chevak, Chuathbaluk, Crooked Creek, Deering, Dillingham, Diomede, Egegik, Ekwok, Elim, False Pass, Golovin, Goodnews Bay, Grayling, Hoonah, Hooper Bay, Hughes, Hydaburg, Igiugig, Kake, Kaltag, Kasaan, Kipnuk, Kivalina, Klawock, Kobuk, Kokhanok, Koliganek, Kotlik, Kotzebue, Koyuk, Koyukuk, Kwethluk, Larsen Bay, Manokotak, Mekoryuk, Minto, Mountain Village, Newhalen, New Koliganek, New Stuyahok, Nome, Noorvik, Northway, Nulato, Ouzinkie, Perryville, Pilot Point, Rampart, Russian Mission, Savoonga, Saxman, Scammon Bay, Selawik, Shaktoolik, Sheldon Point, Shishmaref, Sleetmute, South Naknek, Stebbins, Stevens Village, Stony River, St. Paul, Takotna, Tatitlek, Teller, Tetlin, Togiak, Toksook Bay, Ugashik, Unalakleet, Wales, White Mountain, and Yakutat.

Plaintiffs' motion is DENIED and defendant's cross-motion is GRANTED as to Bethel.

The parties shall contact chambers within ten days to schedule a status conference to determine the course of further proceedings in this case.

IT IS SO ORDERED.

9. *Supra* Parts III.B.2.b and III.B.2.c.

10. *Supra* Part III.B.2.a.